# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA,

 6              Plaintiff,           Case No.  19-20652

 7      -vs-

 8                                   Detroit, Michigan

 9   JAMES LETKO,                    October 1, 2019

10              Defendant.

11   ---------------------------/

12

13        TRANSCRIPT OF ARRAIGNMENT and INITIAL HEARING

14          BEFORE THE HONORABLE R. STEVEN WHALEN

15        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

16

17   APPEARANCES:

18   For the Government:    Malisa Chokshi Dubal
                            U.S. Department of Justice, Fraud Section
19                          1400 New York Avenue, N.W.
                            Bond Building - 4th Floor
20                          Washington, DC 20005

21   For the Defendant:     David F. DuMouchel
                            Butzel Long (Detroit)
22                          150 W. Jefferson, Suite 900
                            Detroit, MI 48226-4430
23

24       TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING
            TRANSCRIBER NOT PRESENT AT LIVE PROCEEDINGS
25
```

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1                          Detroit, Michigan

2                          Tuesday, October 1, 2019

3                          (At about 1:47 p.m.)

4                                - - -

5                          (Call to Order of the Court)

6              THE CLERK OF THE COURT: Calling case number 19-20652,

7    United States of America of versus James Letko.

8              MS. DUBAL: Malisa Dubal on behalf of the United

9    States.   Good afternoon, Your Honor.

10             MR. DuMOUCHEL: Good afternoon, Your Honor.  David

11   DuMouchel on behalf of James Letko who is on my left.

12             THE COURT: Good afternoon.  Mr. Letko, you are here

13   to be arraigned on an Indictment that charges you with

14   Conspiracy to Commit Health Care Fraud and Wire Fraud.  If you

15   were convicted or pled guilty to this charge, you'd be subject

16   to a maximum sentence of 20 years in prison, a fine of up to

17   $250,000 or both.

18        You have received a copy of this Indictment, is that

19   right?

20             MR. LETKO: Yes, I have.

21             THE COURT: And did you have the opportunity to

22   discuss this matter with Mr. DuMouchel?

23             MR. LETKO: Yes I have, Your Honor.

24             THE COURT: Very good.  Mr. DuMouchel.

25             MR. DuMOUCHEL: Your Honor, we'd waive the reading of

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1    the Indictment and Mr. Letko will stand mute.

2              THE COURT: I'll enter a plea of not guilty on the

3    Defendant's behalf.

4        I do have a Pretrial Services Report that recommends an

5    unsecured bond with a number of conditions.  Any objection?

6              MS. DUBAL: Your Honor, the United States do have some

7    additional conditions to those that are listed here.

8              THE COURT: Sure.

9              MS. DUBAL: As well as a modification to number eight,

10   and so the United States would ask that Mr. Letko not open any

11   bank accounts in his or his family members' name unless notice

12   is first given to Pretrial Services as to the location of that

13   bank and whose name the bank account is in or any signatories.

14             THE COURT: I didn't hear the last thing you said.

15             MS. DUBAL: I said or any signatories on the account.

16             THE COURT: Anything else?

17             MS. DUBAL: Yes, Your Honor.  And then as to the no

18   health care billing, United States would ask that that

19   condition be no direct or indirect billing to the Medicare

20   Program and that he doesn't cause any billing either to the

21   Medicare Program.

22             THE COURT: As opposed to private insurance.

23             MS. DUBAL: Yes.

24             THE COURT: Which you have no problem with.

25             MS. DUBAL: Correct.

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1           THE COURT:  Mr. DuMouchel.

2           MR. DuMOUCHEL: Your Honor, I'd like to respond.  I

3     don't have any objection to the 10,000 unsecured bond, and I

4     don't have any problem with turning over Mr. Letko's passport.

5     Beyond that I have some concerns about the requested

6     conditions.

7           With regard to not opening any bank accounts without

8     approval -- and this was going to go to the other arguments as

9     well.  Two years ago Mr. Letko's business was raided.  In the

10    interim, the company has instituted significant compliance

11    programs, has been very mindful of the rules and regulations

12    under which it is to operate.

13          THE COURT: Is that the A1C Holdings?

14          MR. DuMOUCHEL: Yes, Your Honor.  At that same time,

15    the Government seized the bank accounts of the business.

16    They're still restrained two years later.  This morning Mr.

17    Letko's personal bank accounts were restrained, so he doesn't

18    have access to that money either.  At some point he will need

19    to open some access to funds.

20          I understand and I don't have a problem with Ms. Dubal's

21    request that Pretrial Services be advised of his opening of

22    bank accounts, but I want to be clear that we would be seeking

23    the opportunity to open bank accounts.  He's got five kids and

24    they're going to need to get some money.  So but with that

25    condition, notifying Pretrial Services what bank it is and so

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1    on, so with that I'm okay. What I'm not okay with is the

2    inability to bill Medicare or other health insurance programs.

3         I was here when you also addressed that same concern with

4    Mr. Lazeki.  Ms. Dubal will point out when I'm finished that

5    there's a difference between those two people, and there is.

6    Mr. Letko still is at that business, acting CEO in all of his

7    business which is different than Mr. Lazeki who is no longer

8    there.  I understand that --

9              THE COURT: (Interjecting) Let me just interrupt with

10   questions.  I just perused the Indictment and according to the

11   Indictment of the -- it's called the Pharmacy Benefit Managers

12   approval --

13             MR. DuMOUCHEL: Yes, Your Honor.

14             THE COURT: The Medicare payments are processed

15   suspended to contract.  Is that still the case?

16             MR. DuMOUCHEL: Yes, Your Honor.

17             THE COURT: So how can he bill?

18             MR. DuMOUCHEL: Correct it.

19             MR. LETKO: We have contracts with over five

20   pharmacies and we have contracts with most of the major PBMs.

21             MR. DuMOUCHEL:  All of which, all of which business

22   has undergone numerous audits in the last two years and there

23   have been no problems with any of them.

24        There's also some hundred employees of A1C and its

25   pharmacies.  The pharmacies individually the Pharmacists take

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1   care of, but the overall company is Mr. Letko's company and

2   while he doesn't --

3              THE COURT:  (Interjecting) So just so I understand

4   this.  So an individual pharmacy that's affiliated with a

5   larger group would submit its own billings?

6              MR. LETKO: The Pharmacists adjudicate the claim

7   (inaudible) yes, Your Honor.

8              THE COURT: Okay, but who submits the billings to

9   Medicare and Medicaid?

10             MR. LETKO:  The PBM.

11             THE COURT:  Who submits to the PBM, the individual

12  Pharmacist or A1C?

13             MR. LETKO: The Pharmacist pushes a button to

14  adjudicate a claim and then the PBM basically processes that.

15             THE COURT: I guess my question is this.  What do you

16  or A1C have to do with billing or causing a billing to be made

17  to Medicare and Medicaid?

18             MR. LETKO: I just assume since I'm an owner and I'm

19  the owner of the pharmacies that I do not want to be

20  responsible.  I'm indirectly in here, so I want to make sure my

21  business can function.

22             THE COURT: I don't know if that answers the question.

23  It sounds to me -- and maybe I'm missing something here -- but

24  if I order that you don't bill or cause to be -- have any bills

25  submitted to Medicare or Medicaid, that's not going to have any

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    effect on your business.

2          MR. LETKO: Absolutely it will be.

3          THE COURT: How?

4          MR. LETKO: We have a second line of business; it's

5    called the Medicare Part B business. We have been a bid winner

6    since 2013.  We currently have 45,000 customers that we submit

7    billings to.

8          THE COURT: So you do submit billings?

9          MR. LETKO: Yes.  So there's two different areas of

10   the business.  There's one that's my Pharmacists press a button

11   and I guess they directly submit the bill and then there's the

12   second line of business which is the Durable Medical Equipment

13   business where my name is on all the paperwork.

14         THE COURT: And that's strictly related to Durable

15   Medical Equipment?

16         MR. LETKO: Correct, which is not a -- not related to

17   this case.

18         THE COURT: Go head.

19         MR. DuMOUCHEL: Your Honor, I have two responses.

20   One, and I understand Your Honor's question was for

21   information.  Mr. Letko's concern is we don't want to be seen

22   as indirectly causing billing, so that's our concern --

23   directly or indirectly.

24      Here, however, as I mentioned, two years ago -- compliance

25   programs have been in place for the last two years.  There's no

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    allegations in this Indictment of anything happening since that

2    time.  We realize there's a lot of answers to that.

3              THE COURT: So for the last two years a compliance

4    program has been in effect and he's been --

5              MR. LETKO:  (Interjecting) The compliance program

6    actually went into place in 2013 when I --

7              THE COURT: (Interjecting) What I'm saying though is

8    since that compliance -- what I'm asking is since that time,

9    there have been audits?

10             MR. LETKO: We've been audited prior to the raid and

11   after the raid.  We've been audited for years and we --

12   basically we've done very well with those audits and then

13   there's some talk about terminations of Agreements and

14   everything, but we actually had to fight and I had several

15   lawsuits with the PBMs and at this point, none of those

16   lawsuits have ended against me.  I've done settlements and

17   I've --

18             THE COURT: (Interjecting) Well, I'm not -- having a

19   lot of lawsuits is not something that's giving me a lot of

20   confidence, so maybe you should let your attorney talk.

21             MR. LETKO: No, I understand.

22             MR. DuMOUCHEL: Let me just -- and I know this is

23   repeating a little bit.  Mr. Letko is represented by Counsel,

24   not just me but other lawyers, who actually help with the

25   business.  He's not going to do anything when he knows that the

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

```
 1    Government's looking, has been looking, is going to continue to
 2    look.  He's not going to do anything that number one would
 3    violate a rule of this Court.  These Court orders -- I don't
 4    say this to be patronizing -- mean something and they're
 5    ordered not to submit any false billings, not going to submit
 6    any false billings and there's no need to prevent him and his
 7    business from operating and putting all these people out of
 8    work.  There's just no point in that at all.
 9         Now I understand.  Could something get through before the
10    Government finds it?  Sure. True in every case.  There's no
11    need and it's just counterproductive here to put 45,000
12    patients who need their diabetes medications out and he's not
13    going to do anything wrong here.  It's not going to happen, and
14    I would urge -- urge overstates it -- request in this case that
15    no such restriction be placed on Mr. Letko.
16              THE COURT: Your turn.
17              MS. DUBAL: Thank you, Your Honor.
18              THE COURT: Let me start with maybe what's the easy
19    part first which is on the opening of bank accounts.  Mr.
20    DuMouchel says you know, he's fine with notifying Pretrial if
21    an account is open, but he doesn't want pre-approval.  What's
22    your position?
23              MS. DUBAL: Notification is fine, Your Honor. I don't
24    have a problem with that.
25              THE COURT: Then let's move on to the billing.
```

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

```
 1              MS. DUBAL: Okay.  So, Your Honor, just to give you a
 2    little bit of background about this case beyond what's actually
 3    in the Indictment.  So Mr. Letko specifically, he's the CEO of
 4    A1C Holdings.  A1C Holdings is the parent company of a number
 5    of subsidiary companies, and so you have A1C Holdings at the
 6    top and underneath that you have a number of subsidiary
 7    holdings, about 10 or so I would say an estimate, about 10 to
 8    12 and those holding companies, none of those holding companies
 9    are in Mr. Letko's name.
10         Underneath the holding companies are all of the
11    pharmacies, the retail pharmacies or purported retail
12    pharmacies and none of those retail pharmacies with the
13    exception of All American Medical Pharmacy are in Mr. Letko's
14    name.
15              THE COURT: So just so I'm clear, if one of those
16    individual retail pharmacies were to bill Medicare/Medicaid,
17    that would have nothing to do with Mr. Letko?
18              MS. DUBAL: No.  It absolutely has to do with Mr.
19    Letko because those pharmacies sit underneath A1C Holdings, the
20    corporate entity.
21              THE COURT: If they're acting independently --
22              MS. DUBAL: Yes, I'm sorry.  I interrupted Your Honor.
23    Go head.
24              THE COURT: That's my question.  So acting
25    independently I'm unclear even if there's some --
```

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

```
1            MS. DUBAL: (Interjecting) Sure.  Let me clarify that
2      then.  They're not acting independently.  All of these
3      pharmacies are purportedly retail pharmacies, but they're in
4      fact functioning as mail order pharmacies and it was at Mr.
5      Letko's direction that these pharmacies were specifically put
6      -- they were -- the individuals whose names that are on that
7      paperwork, it was specifically directed by Mr. Letko to make
8      sure that his name was not on that paperwork because Mr. Letko
9      was concerned that if the PBMs or if Medicare were to find out
10     that his name was on that paperwork, that they would not either
11     contract with him or that they would initiate an audit or an
12     investigation and that is a result of a civil investigation --
13     I'm sorry -- a civil settlement that took place with Mr.
14     Letko's brothers back in 2016.
15          And so as a result of that, it was at Mr. Letko's
16     direction that all of these retail pharmacies were purchased by
17     him.  He's the one that goes to the site, visit or sends an
18     individual within his company to make site visits to identify
19     under-performing pharmacies or find areas to create new
20     pharmacies.  And then once those pharmacies are purchased or
21     traded by Mr. Letko, after that they will send patients
22     expensive medications or diabetic testing supplies and now
23     while at the -- and this is by mail order.  All of these
24     pharmacies have very little if any retail business whatsoever.
25          So the Pharmacists that are working at those pharmacies,
```

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1  Pharmacists in charge and the staff, while they may be looking

2  in the computer and processing what's happening in the

3  computer, all of the billing and the IT and things like that

4  are happening at Global Health Care which is Mr. Letko's

5  brother's company that they share services with.  A1C Holdings

6  shares billing services with Global, which by the way, the

7  District of New Jersey is investigating Global Health Care for

8  a very similar type of an investigation involving a very

9  similar type of fraud.

10     And so any billing that is happening at any of those

11  pharmacies whatsoever are at Mr. Letko's direction; is at his

12  direction that medications were being sent to patients without

13  their consent and that were unnecessary.  It was his direction

14  that patients were -- there was absolutely no attempt by any of

15  the retail pharmacies to collect any type of co-pays which

16  induced these elderly Medicare patients who are also in some

17  cases disabled to accept medications and not initiate returns

18  and we have emails as well as documents and witness testimony

19  to support that more specifically, and a grand jury returned an

20  Indictment finding as such as is -- some of which is outlined

21  in the manner and means of the Indictment itself. So Mr.

22  Letko's directly involved with the billing and causing billing

23  to the Medicare Program.

24     Furthermore, the way in which these retail pharmacies were

25  acquiring their patient base was exactly from what Mr. Letko

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1  just mentioned which is his DME business.  So the DME business

2  is billed through the Part B side of Medicare and pharmacy is

3  billed through the Part D side.  And so some time in 2013,

4  reimbursement for the diabetic testing supplies decreased

5  pretty dramatically from the Part B side.  And so at Mr.

6  Letko's direction, and when we have witness testimony to

7  support this, it was at Mr. Letko's direction that there was a

8  shift and a direction for A1C Holdings to direct all of their

9  pharmacies to start billing through the Part D as in dog

10  program and so Mr. Letko's involvement with the Medicare

11  Program, both a Part D and Part B prospective is -- he's

12  causing billing directly as well as indirectly to the program.

13      And then lastly, Your Honor, I would say that as far as

14  the Part B is concerned, Mr. Letko is also well aware of an

15  investigation in the Southern District of Georgia where

16  they're investigating his involvement with a DME company that

17  he's also an owner of.

18      And so in terms of trying to mince hairs in terms of his

19  involvement with the Medicare Program, Mr. Letko's directly

20  involved with all of it and this is an 80 million dollar fraud,

21  and while Mr. DuMouchel has represented that after the search

22  warrant they implemented this compliance -- I will note that

23  Mr. Letko himself stated that their compliance program was in

24  place in 2013 and if you'll note, the timeframe of the

25  Indictment, Your Honor, was in -- began in 2013 and continued

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    until October of this year.

2        But furthermore, two years ago once the search warrant was

3    actually executed.  Since then Mr. Letko has opened up new

4    pharmacies and in other individuals' names and he's taken

5    patients from any of the pharmacies that lost PBM contracts and

6    he's shifted them over into these new pharmacies.  Again,

7    pharmacies where his name is nowhere on any of that PBM

8    paperwork; pharmacies where his name is not on the corporate

9    paperwork.  They're all purportedly owned by these holding

10   companies which are essentially shell companies that are then

11   owned by A1C.

12       So really the level of complexity and the amount of steps

13   that Mr. Letko has repeatedly taken over the course of not only

14   the timeframe of the Indictment, but by his own account his

15   involvement with the Part B side as well, it would be nearly

16   impossible for the United States to be able to prevent him from

17   you know, causing false billings to the Medicare Program.

18           THE COURT: Let me ask you a question.  You said it's

19   continued through this year.  The Indictment alleges continuing

20   -- that the conspiracy is continuing through around the end of

21   2018.  So my question is between the end of 2018 -- it's a

22   two-part question -- between the end of 2018 and now in this

23   case has there been any further investigation or any further

24   indication of false billings by any of these entities?

25           MS. DUBAL: Your Honor, the investigations ongoing.

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

```
 1              THE COURT: You mentioned an investigation in Georgia?

 2              MS. DUBAL: There's two investigations; one in the

 3    District of New Jersey and one in the Southern District of

 4    Georgia.

 5              THE COURT: And those are both Federal investigations

 6    in two other Districts?

 7              MS. DUBAL: Yes, sir.

 8              THE COURT: Are there Indictments out of those

 9    jurisdictions or just ongoing investigation?

10              MS. DUBAL: Ongoing investigation.

11              THE COURT: Okay.  Mr. DuMouchel, I'll give you a

12    chance to respond.  I mean it sounds like we've got fairly

13    complex corporate structure which quite frankly always raises

14    eyebrows, and we have two independent investigations going on

15    of these companies.  So --

16              MR. DuMOUCHEL: I understand all of that, and I don't

17    want to be disrespectful to Miss Dubal at all, but there's a

18    part of me that wants to say so what?  Those allegations if

19    they are will be defended.  With all respect, that's not why

20    we're here.  The concern is --

21              THE COURT: (Interjecting) Exactly.  I'm not deciding

22    guilt or innocence, but I do have to decide whether there are

23    conditions that would reasonably assure that there's not going

24    to be any other or any -- I won't say any other -- but any

25    illegal activity.
```

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1        MR. DuMOUCHEL: No, I understand and I think that in

2  the intervening past two years the fact that there's an

3  investigation you know, okay.  There's an investigation.  There

4  haven't been charges arising out of there.  If there are, there

5  will be.  Certainly Mr. Letko is well aware that he's being

6  looked at, that everything he's doing is being looked at.  He's

7  not going to do something to violate this Court's Order,

8  jeopardize his bond, get himself charged with something else,

9  get himself charged with violating bond conditions.  It's not

10  going to happen.  If it does, there's recourse to it.

11        THE COURT: But if I understand the Government's

12  position -- you correct me if I misstate it -- that there is a

13  process in place that is so large and so complex that it

14  doesn't matter if he individually says look, I'm not going to

15  do anything.  He's already got a system in place to propagate

16  these billings.

17        MR. DuMOUCHEL: No, Your Honor. I don't think that's

18  the case and I think that just as Miss Dubal has pointed out,

19  there are ways -- the Government is aware of those, can unwind

20  those if they need to be unwound.

21        THE COURT: Apparently they're unwinding them in

22  Georgia and Missouri -- New Jersey.

23        MR. LETKO: New Jersey is nothing. New Jersey is --

24        THE COURT: (Interjecting)  Let your attorney speak.

25        MR. DuMOUCHEL: If they do, they do.  That hasn't

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    anything to do, I submit, with regard to a bond condition that

2    puts the company out of business today.  And they want to get

3    an Injunction against him submitting things to Medicare, they

4    can do what they're going to do, but as a condition of bond

5    based on this case, that's just not right to put this company,

6    already seized the accounts from that, seized his personal

7    accounts today and now effectively put the company out of

8    business based upon a pending charge where he's presumed to be

9    innocent.

10       The Government, United States will be well protected by

11   the Court Order that he not submit any illegal false Medicare

12   billings.  That will be a condition of bond in addition to a

13   statute, be a condition of bond which the Court can respond to

14   at that time.

15          THE COURT: Tell me again how many people work for

16   this -- these aggregate corporations that you say would be put

17   out of business approximately.

18          MR. LETKO: Between 90 and a hundred as of today.

19          THE COURT: Okay.  So let me ask you this.  This is a

20   balancing act I have to do here, and it appears that if I

21   impose the condition of no billing, of no billing, that that's

22   a significant part of their business.  They're out of business;

23   90 to a hundred people are out of work.

24       On the other hand, Mr. DuMouchel says more less

25   paraphrasing what I said in the other case, you know if you do

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1    submit false billings while you're under supervision and while

2    you're under Indictment, you know that's really pretty risky

3    business.  So on balancing the effect it would have not only on

4    his livelihood but on the livelihoods of apparently 90 to a

5    hundred people versus the likelihood or the protection that

6    would be imposed by him being under court supervision, how do I

7    make that balance?

8         MS. DUBAL: Your Honor, if I could just comment

9    briefly.  The impact of Mr. Letko's actions on the United

10   States taxpayer in a short amount of time was an 80 million

11   dollar payout by the Medicare Program and that was 100% as a

12   result of Mr. Letko's actions.  Full stop. And it would be

13   virtually impossible -- and this Defendant is distinguishable

14   from Mr. Burdick's client, Mr. Lazeki because Mr. Letko has

15   taken so many steps to conceal his involvement with the

16   Medicare Program and billing to the Medicare Program and

17   causing billing to the Medicare Program that it would be

18   literally virtually impossible for the United States to be able

19   to stop Mr. Letko.  We'd be in a position where we wouldn't be

20   able to stop him until millions of dollars would probably go

21   out the door again.  80 million dollars in less than about four

22   and a half years, that's a significant amount being paid out of

23   the Medicare Program as a result of Mr. Letko's actions and so

24   it would be virtually impossible versus a mom and pop pharmacy

25   here in Michigan where they simply don't have that type of

1    volume.

2        Mr. Letko has pharmacies all over the country, and when he

3    is -- when he has been shut down and a PBM did find out that he

4    was involved in activities that he shouldn't have been involved

5    in and violated the PBM contracts or violated CMS regulations,

6    Medicare regulations, he just shifted his patients over to his

7    brother's company so they could be serviced by his pharmacies

8    over there.  So Mr. Letko is literally willing -- he's done

9    almost anything to conceal his ownership and insure that he

10   still gets that bottom line payout.

11       And so while I do understand the importance of balancing,

12   Your Honor, in this circumstance I think that it is a unique

13   circumstance given Mr. Letko's position as the CEO and the

14   magnitude and severity and complexity of his conduct during the

15   relevant timeframe of this Indictment.

16           THE COURT: Okay.  Let me start with -- I'll tell you

17   the conditions, but let me start with this last condition which

18   is at issue which is a request that I impose a condition that

19   you not bill or cause to be billed to Medicare/Medicaid or any

20   other Government health program.

21       I do see your position and this is without any derogation

22   to the presumption of innocence.  I'm not trying the case, but

23   one of the factors that I do have to look at under the Bail

24   Reform Act is the seriousness of the offense, the strength of

25   the Government's proofs, the type of offense as well as your

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1    personal characteristics and that includes your business

2    practices.  I have to look at all of that.

3         As the Government points out, this is what, 80 million

4    dollars, a hundred million dollars case?  This is a lot of

5    money that's charged all right?  I'm not trying you right now,

6    okay?  That will come later.

7              MR. LETKO:  It's a big company.

8              THE COURT:  It's a big company and it's not only a

9    big company, but it's a company that has a very labyrinthine

10   structure.  You have subsidiaries and sub-subsidiaries that

11   you're at the top of the pyramid, okay?

12        You have -- in addition to these charges, you have two

13   other Federal investigations going on, one in Georgia, one in

14   the District of New Jersey.  Those haven't ripened into an

15   Indictment yet and they may not.  I don't know, but -- I'm

16   speaking, okay?  We have investigations going on.

17        You've -- not only do we have the seriousness of the scope

18   of the charges, but we have a corporate structure that is set

19   up that I'm not even sure at this point whatever your

20   intentions are you even have control over what's going to be

21   billed and what is not going to be billed.

22        Given all of the circumstances and I am concerned about

23   these other employees, but given the scope of the charged

24   conspiracy, given the amount of money and the amount of

25   activity alleged, given the corporate structure and I do accept

```
 1    the Government's argument that if there were some kind of false
 2    billing somewhere in this tangled knot of companies, it would
 3    be difficult to faret that out.
 4         I also appreciate Mr. DuMouchel's argument and I mentioned
 5    this in the last case, that you got to be pretty stupid to
 6    continue or to participate in illegal activity while you're
 7    under supervision, but my job and the scope of my decision is
 8    to determine if -- what conditions would reasonably assure the
 9    safety of the community and that would include ensuring against
10    false billings, and on balance, I find that the condition that
11    you not bill or cause to be billed any Government health care
12    programs, Medicare/Medicaid, et cetera, is a condition that is
13    necessary to give me that reasonable assurance.  So I'm going
14    to include that condition among the conditions.
15         So let me run over the conditions.  It's $10,000 unsecured.
16    You'll report as directed to Pretrial Services.  Your travel is
17    restricted to the continental United States.
18              MS. DUBAL: Your Honor, if I may just comment about
19    the travel restriction?
20              THE COURT: Yes.
21              MS. DUBAL: I had spoken to -- Mr. DuMouchel made
22    reference to another counsel that's also working with Mr. Letko
23    prior to the hearing, and we had agreed that the travel would
24    actually be restricted to the state of New Jersey.  However, if
25    Mr. Letko wanted to travel within the continental United States
```

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1   for business purposes, he would notify Pretrial Services as

2   well as myself and let us know what business entity he was

3   going to have --

4           THE COURT: (Interjecting)  You're saying travel

5   District of New Jersey, Eastern District of Michigan for court.

6           MS. DUBAL:  Yes.

7           THE COURT:  Any other business travel with Pretrial

8   notification or permission.

9           MS. DUBAL: With Pretrial and United States

10  notification.

11          MR. DuMOUCHEL: Your Honor, it's a tough one when

12  you've got two lawyers who apparently aren't on the same page,

13  not as (inaudible) but other Defense Counsel.  If that's what

14  he said, that's what he said. But for example, Mr. Letko has a

15  daughter in college in Florida and I don't think he should be

16  precluded --

17          THE COURT: (Interjecting) Let me tell you something.

18  I've read the Pretrial Services Report which indicates that

19  Defendant poses a risk of nonappearance because he possesses a

20  passport.  He'll turn his passport in.  I don't see reading

21  this Report and I haven't heard anything that indicates to me

22  that there would be any other conditions that would cause me to

23  think he's a flight risk.  I'll limit it to the continental

24  United States.

25          MR. DuMOUCHEL: Okay with me, but I don't want to say

1    something inconsistent.

2          THE COURT: Well, I don't know.  I've got to make the

3    decision.  I'm looking at the Report.  He can't leave the

4    country without a passport and he can't leave the country

5    unless he gets not Pretrial's permission, my permission.

6          MS. DUBAL: If I may to make a record.

7          THE COURT: Go head.

8          MS. DUBAL: The reason for the restriction in terms of

9    notifying Pretrial Services as well as the United States

10   outside of travel to New Jersey is because of all the different

11   businesses that he has throughout the country, and it's to

12   insure that if he is opening up any new entities or if he is

13   visiting any entities, the United States is made aware of those

14   contacts.

15         THE COURT: He doesn't have to leave the state to open

16   up a new entity in some other state.

17         MS. DUBAL: Okay.

18         THE COURT: I'll tell you what.  Let me start from the

19   beginning so that we're all real clear.  Please feel free to

20   interrupt me if I misstate anything.

21       Report as directed, 10,000 unsecured.  You'll report as

22   directed to Pretrial Services.  Your travel is restricted to

23   the continental United States.  And I'll tell you what; you

24   don't have to get permission to go to another state, but you'll

25   notify Pretrial Services if you're going to do that. Got that?

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    MR. LETKO: Thank you, Your Honor.

2    THE COURT: You'll surrender your passport to Pretrial

3    Services by 4:00 p.m. October 2nd -- and that's tomorrow -- any

4    passports that you have and you will not apply for or obtain

5    any new passports or any other internal travel documents such

6    as for example an enhanced driver's license.

7    Submit to a one-time drug test. If that's negative, there

8    will be no further testing. If it's positive, such further

9    testing and/or treatment as directed by Pretrial Services.

10    Okay. You're not to have any contact with any alleged

11    victims, any witnesses or any co-defendants unless in the

12    presence of counsel or through your counsel in order to prepare

13    your defense, and that would include if you have a joint

14    defense situation and there's a meeting with counsel, it's not

15    a problem. Yes.

16    MR. DuMOUCHEL: On that condition, on that one, I'd

17    ask that that not be included. A number of these people or

18    several of these people work for Mr. Letko. They need to have

19    conversations about the day-to-day business. I don't know what

20    we're --

21    THE COURT: (Interjecting) They're his employees?

22    MR. DuMOUCHEL: Yes. Can we say --

23    THE COURT: I'll tell you what I'll do. No contact

24    with any alleged victims, witnesses or co-defendants except

25    number one, the presence of your counsel in order to prepare

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    your defense or number two, for business purposes.

2                MR. DuMOUCHEL:  That's fine.  Thank you.

3                THE COURT: And as I indicated, no billing direct or

4    indirect of any Government health care program. Now --

5                MR. DuMOUCHEL: Your Honor, may I --

6                THE COURT: (Interjecting) Hang on one second.  We've

7    had a lot of discussion -- it's almost like a detention

8    hearing, although the issue wasn't detention.  The issue is

9    what the conditions are.  So this is Judge Lawson's case.

10               MR. DuMOUCHEL: Yes.

11               THE COURT: And I'll say this to both parties.

12   Anything that I've ordered that any of you disagree with, you

13   can appeal de novo to Judge Lawson and take it up with him.  If

14   I'm wrong, if he says I'm wrong, I'm at peace with that.  If he

15   says I'm right, I'm at peace with that also.

16       Okay, anything else for the record?

17               MR. DuMOUCHEL: Yes.  I don't know quite how I'm going

18   to suggest this, but I'll think of something.  The nonbilling

19   of Medicare, can we make -- I'm not going to reargue that here,

20   probably will do so though -- can we make that condition

21   effective at a later date like 90 days from now?  We're

22   probably going to have to transition his business.  Otherwise,

23   the things going to close and people will be out of work.  The

24   interest is to keep Mr. Letko out of billing. If we can make

25   that condition down the road so that in the meantime we can do

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1    whatever we have to do to hope the business continues without

2    him --

3              THE COURT: (Interjecting) Do you have receivables

4    right now?

5              MR. DuMOUCHEL:  Pardon?

6              THE COURT:  Does he have receivables right now?

7              MR. LETKO: Yes.  Just have patients that won't get

8    their supplies.  (Inaudible)

9              THE COURT: They'll get it somewhere else, but I

10   actually -- what you're suggesting crossed my mind and the

11   reason it crossed my mind was my concern for these 90 or a

12   hundred people who are out there.  So if I put a condition that

13   effective 90 days from now, 60 days from now --

14             MS. DUBAL: Your Honor, one large aspect of this

15   fraudulent scheme which is one of the paragraphs within the

16   manner and means of the Indictment is that Mr. Letko's -- at

17   Mr. Letko's direction, patients were simply transferred over to

18   his brother's company so that his brother's company could then

19   continue to bill those exact patients and his brother's company

20   is the very subject of the District of New Jersey

21   investigation.

22             THE COURT: So his brother's company is not directly

23   involved in this Indictment, am I right?

24             MS. DUBAL: His brother's company is referenced in

25   this Indictment, Your Honor.

```
 1          THE COURT: Are they charged? Anybody in that --
 2          MS. DUBAL: (Interjecting) No.  It's an ongoing
 3   investigation in the District of New Jersey, but 90 days, 60
 4   days, 30 days is more than enough time for Mr. Letko to simply
 5   transfer those patients over to another Letko-owned business to
 6   one of his brothers and then continue to get -- obtain
 7   ill-gotten gains.  That is the Government's position, Your
 8   Honor, and he consistently did that and it was a matter of
 9   transferring those patients by a click of a button.  That's how
10   quickly  --
11          THE COURT: (Interjecting) If he does that, if he does
12   that, then he's a co-conspirator in the New Jersey case.
13          MS. DUBAL: He already is a co-conspirator.
14          THE COURT:  He already is a co-conspirator.
15          MS. DUBAL: Well, he would be because he's already
16   transferred patients to his brother's company.  My argument
17   goes back to the complexity and the level at which -- the steps
18   that Mr. Letko took in order to conceal this fraud and make
19   sure (inaudible)
20          THE COURT:  What about the receivables that he's got
21   out there right now?  Things that have already been billed,
22   there's nothing I can do about that.
23          MS. DUBAL: Sure.  Yeah, I agree there's nothing that
24   can be done about that, but I'm talking about additional
25   billing to the Medicare Program, Your Honor, or causing billing
```

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

1    to the Medicare Program.

2         THE COURT: Then let me ask you.  I think -- doesn't

3    that answer your concern?  I mean you got receivables.  You

4    have a business.  You have employees.  If he stops billing

5    today, how is that going to effect those employees as opposed

6    if he keeps billing for the next three months?  I mean I'm not

7    sure what the marginal advantage is to --

8         MR. DuMOUCHEL: To getting 90 days to transition a

9    business?  The company will be able to bill for the next 90

10   days.  He can try to -- in the meantime the business can stay

11   alive.  Business can be run, and he can transition the business

12   and transition himself out of that position and these people

13   don't get laid off or let go.

14        THE COURT: I don't want to get too deeply into what

15   the financial situation of the business is, but they've got

16   receivables. They've got capital I assume, that they can wind

17   up with -- wind up the business.  He's got 85% he says of his

18   business is Medicare and Medicaid.  Presumably this 15% in

19   private insurance, he can continue that.  I'm not convinced

20   that it's going to -- I mean I don't know.  I don't know what

21   it's going to do to the business.

22        MR. LETKO: It's about 98% --

23        THE COURT: (Interjecting)  Well, it was 85, now it's

24   98.  You should really talk to your attorney before you speak.

25   It's really a good idea.

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

```
 1          MR. LETKO: Are you sure --
 2          THE COURT: (Interjecting) Are you listening to me?
 3          MR. LETKO:  Sorry.
 4          THE COURT:  Sorry.  I don't know if I reminded you
 5   that anything you say other than what you say privately to your
 6   attorney can be used against you in court, so not a good idea
 7   to talk, am I right?
 8          MR. DuMOUCHEL: It's a significant number, yes.  I've
 9   got the note saying 95%.  Whatever it is, it's a significant
10   number and that would give us time.  So this whole --
11          THE COURT: (Interjecting) I mean the Government says
12   he's going to use the time to transfer the patients to his
13   brother's business.
14          MR. DuMOUCHEL: Yeah, we've heard that; that he's
15   going to do all these bad things that will cause problems.
16   Well, he's not going to do any of them and they're making it
17   very clear how much they're looking and somehow this
18   labyrinthine network, somehow they figured it now and he's well
19   aware of what's going on here and he's not going to go out and
20   do something.  Your Honor points out in a question would that
21   make him a co-conspirator.  We'd rather not do that.  Would it?
22   Might.  Is he going to do something that would make him that?
23   No.  He's ordered by a condition of bond not to violate laws.
24   He's got 90 days if he has to, to try to get out of this to
25   keep these people there.
```

30

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

```
 1              THE COURT: I'll tell you what.  I'll give him 30 days
 2    to wind up his business.
 3              MR. LETKO: Thank you.
 4              THE COURT: The condition that he not bill any
 5    Government agency will take effect 30 days from today and Mr.
 6    Letko, I don't even need to tell you, but I'll tell you anyway.
 7    Really really really bad things are going to happen to you if I
 8    find out or if the Government finds out that you're violating
 9    any of these conditions, much less the condition that you're
10    engaged in any fraudulent activity.
11              MR. LETKO: I understand, Your Honor. Thank you, Your
12    Honor.
13              MR. DuMOUCHEL: Thank you, Your Honor.
14              THE COURT: Anything else?
15              MS. DUBAL: When you went through the bond conditions
16    you were just summarizing what we've discussed here today, I
17    don't think I heard you say, so I want to clarify the bond
18    condition related to the bank accounts.
19              THE COURT: Thank you.  I did not -- I neglected to
20    mention that.  Any new bank accounts or cash accounts that you
21    open you will provide notice to Pretrial Services of the type
22    of account, the financial institution, et cetera.
23              MR. LETKO: Yes, Your Honor.
24              THE COURT: Thank you.
25              MS. DUBAL: Thank you, Your Honor.
```

UNITED STATES OF AMERICA v. JAMES LETKO
ARRAIGNMENT and INITIAL HEARING

```
 1              THE COURT: Are we done?

 2              MR. DuMOUCHEL: Thank you.

 3              THE COURT: Thank you.

 4              (Proceedings adjourned at about 2:30 p.m.)

 5                       -  -  -

 6              COURT REPORTER'S CERTIFICATION

 7

 8

 9    STATE OF MICHIGAN)

10                     )  SS.

11    COUNTY OF WAYNE  )

12

13        I, Janice Coleman, Federal Official Court Reporter, in and

14    for the United States District Court for the Eastern District

15    of Michigan, do hereby certify that pursuant to Section 753,

16    Title 28, United States Code, that the foregoing is a true and

17    correct transcript of the digital sound recording, transcribed

18    to the best of my ability, which was held in this matter and

19    that the transcript page format is in conformance with the

20    regulations of the Judicial Conference of the United States.

21

22                    /S/ JANICE COLEMAN

23                    JANICE COLEMAN, CSR NO. 1095, RPR

24                    FEDERAL OFFICIAL COURT REPORTER

25
```

*UNITED STATES OF AMERICA v. JAMES LETKO*
*ARRAIGNMENT and INITIAL HEARING*

1    DATED:   October 7, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25