```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF MICHIGAN
 2                           SOUTHERN DIVISION

 3     United States of America,

 4                          Plaintiff,

 5     -v-                                       Case No. 19-20652

 6     D-1  James Letko,
       D-2  Steven King,
 7     D-3  Rami Lazeki,
       D-4  Patricia Flannery,
 8     D-5  Katherine Peterson,

 9                          Defendants.
       _____/
10

11                          MOTION HEARING
                           September 10, 2020
12
                    BEFORE THE HONORABLE DAVID M. LAWSON
13                      United States District Judge

14             HEARING CONDUCTED VIA VIDEO CONFERENCE
                   ALL PARTIES APPEARING REMOTELY
15

16     APPEARANCES:

17     FOR THE PLAINTIFF:    MALISA CHOKSHI DUBAL
                             JOHN McCORMACK
18                           United States Attorney's Office
                             211 West Fort Street, Suite 2001
19                           Detroit, Michigan  48226

20     FOR THE DEFENDANT     GEORGE B. DONNINI
       JAMES LETKO:          THEODORE R. EPPEL
21                           Butzel Long
                             150 West Jefferson, Suite 100
22                           Detroit, Michigan  48226

23     (Appearances continued to following page)

24              To Obtain a Certified Transcript Contact:
                 Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                      www.transcriptorders.com
```

```
 1      APPEARANCES CONTINUED:

 2

 3      FOR THE DEFENDANT        NATASHA D. WEBSTER
        STEVEN KING:             Federal Community Defender
 4                               613 Abbot Street
                                 Detroit, Michigan  48226
 5

 6      FOR THE DEFENDANT        JAMES W. BURDICK
        RAMI LAZEKI:             Burdick Law, P.C.
 7                               1760 South Telegraph Road
                                 Suite 300
 8                               Bloomfield Hills, Michigan  48302

 9

10      FOR THE DEFENDANT        N.C. DeDAY LaRENE
        PATRICIA FLANNERY:       LaRene & Kriger
11                               645 Griswold Street
                                 Suite 1717
12                               Detroit, Michigan  48226

13      FOR THE DEFENDANT        MARK A. BERMAN
        KATHERINE PETERSON:      Hartmann, Doherty, Rosa,
14                                 Berman & Bulbulia, LLC
                                 433 Hackensack Avenue
15                               Suite 1002
                                 Hackensack, New Jersey  07601
16

17

18

19

20

21

22

23

24

25
```

3

TABLE OF CONTENTS

MATTER                                                              PAGE

MOTION HEARING

MOTION TO DISMISS COUNT ONE
Argument by Mr. Eppel.....................................    7
Argument by Ms. Dubal....................................   14
Ruling by the Court......................................   17

MOTION TO COMPEL DISCLOSURE OF BRADY MATERIALS
Argument by Mr. Doninni..................................   21
Argument by Mr. McCormack...............................   33
Ruling by the Court......................................   42

MOTION TO STRIKE SURPLUSAGE
Argument by Mr. Doninni..................................   44
Argument by Ms. Dubal....................................   48
Further Argument by Mr. Doninni.........................   52
Ruling by the Court......................................   53

MOTION FOR BILL OF PARTICULARS
Argument by Mr. Berman..................................   56
Argument by Mr. Doninni..................................   59
Argument by Mr. McCormack...............................   60
Ruling by the Court......................................   67

MOTION TO SEVER
Argument by Ms. Webster.................................   70
Argument by Mr. Eppel...................................   72
Argument by Ms. Dubal...................................   75
Ruling by the Court.....................................   80

CERTIFICATE OF COURT REPORTER..........................   86

Motion Hearing - September 10, 2020                                    4

1    Detroit, Michigan

2    September 10, 2020

3    10:58 a.m.

4                          *      *      *

5              THE COURT:  Court is in session.  This is the United

6    States District Court for the Eastern District of Michigan.

7              This is Case Number 19-20652, United States of

8    America versus James Letko and others.

9              We are here today via videoconferencing.  I find that

10   the proceedings cannot be conducted in person without serious

11   jeopardy to public health.

12             The motion hearing is being conducted via video,

13   because I also find that further delaying these proceedings

14   would cause harm to the interests of justice.

15             Before we begin, would the Government put its

16   appearance on the record, please?

17             MS. DUBAL:  Yes, your Honor.  Good afternoon.

18   My name is Malisa Dubal.  I'm appearing on behalf of the

19   Government.

20             And John McCormack is appearing or is on the phone as

21   well on behalf of the Government.

22             THE COURT:  All right.  Mr. McCormack apparently is

23   not able to communicate with us, however.

24             Mr. Donnini, please, your appearance on behalf of

25   your client.

```
 1              MR. DONNINI:  Yes, your Honor.  George Donnini, and
 2    I'll go ahead and on behalf of T.R. Eppel, on behalf of
 3    Mr. Jim Letko, who is also participating.
 4              THE COURT:  All right.  And for Defendant King.
 5              MS. WEBSTER:  Good afternoon, your Honor.  Natasha
 6    Webster on behalf of Mr. King.
 7              THE COURT:  And for Defendant Lazeki.
 8              MR. BURDICK:  Good afternoon, your Honor.  James
 9    Burdick appearing on behalf of Mr. Lazeki who is, as you can
10    see, seated behind me.
11              THE COURT:  Yes.  Lazeki.  Pardon me.  I
12    mispronounced his name and I apologize.
13              Mr. Burdick, is it possible for you to raise your
14    volume?
15              MR. BURDICK:  If somebody will tell me how.  DeDay,
16    can you help me here?
17              THE COURT:  Or get closer to the microphone.
18              MR. BURDICK:  Oh, let's see.  Let's see if I can pull
19    this.
20              How about now; is that any better?
21              THE COURT:  Slightly better.
22              Ms. Twedt, can you hear Mr. Burdick all right?
23         (Discussion held off the record.)
24              THE COURT:  Thank you.
25              And appearance for Defendant Flannery.
```

1        MR. LaRENE:  Yes, sir.  Deday LaRene on behalf of

2  Ms. Flannery, who is participating and whose unsmiling visage

3  is available.

4        THE COURT:  All right.

5        MR. LaRENE:  Smiling now.

6        THE COURT:  Thank you.

7        And on behalf of Ms. Peterson.

8        MR. BERMAN:  Good afternoon, your Honor.  Mark A.

9  Berman on behalf of Katherine Peterson, who is sitting to my

10  right slightly behind me.

11        THE COURT:  All right.  We have Defendant Letko's

12  motion to compel disclosure of Brady materials, to strike

13  surplusage, and to dismiss/strike Count 1 of the indictment.

14  We have Defendant Peterson's motion for a bill of particulars.

15  And we have Defendant King's motion to sever.

16        We will begin with Defendant Letko's motion to compel

17  disclosure of Brady materials, which is Docket Number 82.

18        Mr. Donnini.

19        MR. DONINNI:  Thank you, your Honor.

20        MS. DUBAL:  Your Honor.  Your Honor, I apologize.

21        May I ask if your Honor would just implore the

22  Government, if we could just start on the motions that I

23  intended on handling today in the hopes that Mr. McCormack

24  will be able to figure out his technical issues by the time

25  that we are finished with those arguments?  If your Honor

1      would implore the Government.  I apologize for interrupting,

2      but I'm wondering if that would be an option.

3              THE COURT:  Well, it is problematic because of the

4      way I have these prepared.

5              MS. DUBAL:  Okay.

6              THE COURT:  Let's see.  Let me just turn to

7      Mr. Eppel, then, on the motion to dismiss Count 1 of the

8      indictment.

9              Were you going to argue that one, Ms. Dubal?

10             MS. DUBAL:  Yes, your Honor.  I plan on arguing the

11     motion to dismiss, the motion to strike surplusage, and --

12             THE COURT:  All right.  Then we'll take that one.

13             Mr. Eppel, you may proceed.

14             MR. EPPEL:  Okay.  Thank you, your Honor.

15             MS. DUBAL:  Thank you.

16             MR. EPPEL:  Can you hear me okay?

17             THE COURT:  Yes.

18             MR. EPPEL:  Okay.  So I know your Honor has read the

19     briefing carefully, and so I'm not going to go over every

20     single argument that we made in our briefs, but I do want to

21     reiterate some of the main points.

22             The main thrust of our motion is that Count 1 of the

23     indictment in this case rests on new and novel claims that an

24     ordinary person such as Mr. Letko could not have possibly

25     known would result in criminal liability.

1          I will note that the Government failed to address

2    most of our arguments head on in their response.  Instead they

3    argue that the -- because they laid out the basic elements of

4    these charged offenses, that should be enough to prop up each

5    of these allegations that were challenged in our motion.  But

6    simply parroting the elements of the charged offenses should

7    not be a sufficient basis for due process in a case like this

8    that rests on such new and novel claims.

9          First, we argue that the allegation in paragraph 30

10   that Mr. Letko and others committed fraud by concealing

11   Mr. Letko's ownership in some of the A1C Pharmacies was not

12   alleged to be material, nor could it be.

13         And it is interesting to note that in paragraph 32

14   of the indictment the Government specifically alleged the

15   materiality as to the issue of whether these were retail

16   or mail-order pharmacies, but there was no such specific

17   allegation regarding the materiality of Mr. Letko's ownership

18   in paragraph 30.

19         That is likely because the mere fact that Mr. Letko

20   may have had some indirect ownership in the A1C Pharmacies

21   could not have been material as a matter of law.

22         As we laid out in our brief, the any-willing-provider

23   law required the PBMs to allow any qualified pharmacies into

24   their networks.

25         And under the law the only way the A1C Pharmacies

1    could have denied a contract -- could have been denied a

2    contract with the PBMs based on Mr. Letko's ownership was if

3    Mr. Letko was an excluded person under the Medicare rules,

4    which he was not.

5           Simply having the last name of Letko was not a

6    sufficient basis under the law for the PBMs to deny the

7    A1C Pharmacies entry into their systems, and it should not

8    be the basis of a criminal charge in this case.

9           Second, we challenge the allegation in paragraph 32

10   regarding whether the A1C Pharmacies properly disclosed to the

11   PBMs the fact that they were mail-order pharmacies as opposed

12   to retail pharmacies.

13          Mr. Letko could not have possibly or reasonably

14   known that claiming to be a retail pharmacy as opposed to a

15   mail-order pharmacy would result in a criminal charge.

16          As we laid out in our brief, the Medicare rules and

17   regulations gave only a vague definition of what constituted

18   a retail pharmacy and zero definition of what constituted a

19   mail-order pharmacy.

20          And moreover, in terms of, you know, a real-world

21   distinction between a mail-order pharmacy and a retail

22   pharmacy is not as simple as you might think.  In the real

23   world there are retail pharmacies that mail their

24   prescriptions to their patients.  And so that distinction,

25   even in the real world, is not easy to make, let alone under

1      the Medicare rules and regulations.

2              And so we believe that it is fundamentally unfair

3      to subject Mr. Letko to criminal liability for failing to

4      distinguish between these two terms that the very Medicare

5      rules and regulations fail to clearly define themselves.

6              And we do understand that there is case law that

7      says that the knowledge and intent requirements of the fraud

8      statutes cure some of these issues, but frankly, that is --

9      that's cold comfort for someone like Mr. Letko to say to them

10     years later, you know, "Hey, don't worry, you can have a

11     defense at a criminal trial about these issues because we have

12     to prove knowledge and intent," when years ago he is trying to

13     navigate these rules and regulations and figure out whether he

14     is a retail or a mail-order pharmacy.

15             And as the Supreme Court said in the Kolender case,

16     the underlying principle is that no man shall be held

17     criminally responsible for conduct which he could not

18     reasonably understand to be proscribed.  And we feel this

19     is exactly what is happening here in the allegation in

20     paragraph 32.

21             Our third challenge was to the false test claim

22     allegations in paragraphs 33 and 34.  And on this point the

23     Government in their response misconstrues -- misconstrues our

24     basic argument.  Our argument is not that the allegations

25     about test claims should be dismissed because test claims were

1   an ordinary and accepted practice in the pharmacy industry.

2   While it is true that they were, test claims are an ordinary

3   and accepted practice in the industry, our argument here is

4   that the allegations must fail because test claims, even if

5   they were somehow false and fraudulent, did not deprive anyone

6   of money or property.

7          Test claims, as their term suggests, are simply a

8   way for a pharmacy to test whether a prescription might be

9   covered, and if so, how much it might cost.  So test claims

10  are not actual claims that are being submitted for

11  reimbursement.

12         So by their very definition, test claims could not

13  have caused a PBM or plan sponsor or Medicare to actually pay

14  out anything to the A1C Pharmacies.  So even if Mr. Letko was

15  involved in submitting a false and fraudulent test claim, that

16  could have not have -- that could not have violated the fraud

17  statutes because the object of submitting a test claim was not

18  to gain money or property.

19         Our final challenge is to the allegations in

20  paragraphs 35 and 36 regarding refills and transfers without

21  patient consent.  Those allegations both rest on the same

22  flawed attempt to criminalize what are essentially violations

23  of civil regulations and guidance documents.  There is

24  obviously no criminal statute that says it's a crime to send

25  a refill to a patient or transfer a patient without that

```
 1    patient's consent.
 2           And so, as we laid out in our brief, there was this
 3    complex and constantly changing labyrinth of Medicare rules
 4    and regulations and guidance documents that -- some of which
 5    contained these prohibitions against sending refills or
 6    transferring patients without their consent.  But the DOJ's
 7    own policy manual warns about this very situation when it
 8    states "Criminal and civil enforcement actions by the
 9    department must be based on violations of applicable legal
10    requirements and not mere compliance with guidance documents
11    issued by federal agencies."
12           And the reason why the DOJ has that policy is because
13    it recognizes the fact that mere guidance documents are --
14    excuse me -- these guidance documents, they're constantly
15    changing.  They are not fully vetted by Congress.  And they
16    may conflict with other rules and regulations that might be
17    out there.
18           Moreover, there may be competing policy interests
19    that are at play with the policies that are prescribed in
20    these guidance documents.
21           For example, there's a competing policy interest
22    in making sure that patients get refills for prescriptions
23    that they need on a regular basis, and so as a result, these
24    allegations which are built -- in paragraphs 35 and 36 --
25    which are built on civil guidance documents could not have
```

```
 1    possibly given fair notice to Mr. Letko that he might some day
 2    be here in a criminal trial having to defend against these,
 3    you know, alleged violations of civil guidance documents.
 4            That's all I have, your Honor.  And obviously if you
 5    have any questions, I'm happy to address those.
 6            THE COURT:  Thank you, Mr. Eppel.
 7            Let's see.  Ms. Webster, do you have anything that
 8    you would like to contribute to this motion argument?
 9            MS. WEBSTER:  No, your Honor.  I don't have anything
10    to add.  Thank you.
11            THE COURT:  Thank you.
12            Mr. Burdick.
13            MR. BURDICK:  No, your Honor.  He covered everything
14    and so --
15            THE COURT:  Mr. Burdick, I can't hear you.
16            MR. BURDICK:  No, I don't, your Honor.  And I think
17    that his -- he covered everything in his motion and his reply
18    brief to the Government's response in opposition.  He covered
19    everything that I would have covered.
20            THE COURT:  All right.  Thank you.
21            MR. BURDICK:  I have nothing to add.
22            THE COURT:  Thank you.
23            Mr. LaRene?
24            MR. LaRENE:  Thank you.  No.
25            THE COURT:  Mr. Berman.
```

Motion Hearing - September 10, 2020                    14

1              MR. BERMAN:  No, thank you.

2              THE COURT:  Very well.  Ms. Dubal.

3              MS. DUBAL:  Thank you, your Honor.

4         Your Honor, as far as this motion is concerned, the

5    United States -- the defendant has not raised in his -- in his

6    reply brief any additional arguments that were not already

7    briefed by the United States in their response, and so I will

8    just take a few moments to just quickly summarize some of the

9    key points of the United States' response and go from there.

10             First and foremost, as it pertains to whether or not,

11   you know, the crime is sufficiently alleged, the United

12   States' position is that it is.  The indictment is drafted

13   sufficiently.  The elements of the offense properly track the

14   relevant language of the statute.  Defendant is informed of

15   those charges and it allows -- puts him in a position to

16   plead, you know, an acquittal of conviction.

17             And the main arguments that the defense makes are

18   really issues of fact for the jury to decide.  They are not

19   legal issues to be decided at this stage in the litigation,

20   and that would be pretrial.

21             As far as materiality, materiality is properly

22   alleged in the indictment in paragraph 25.  It's a question

23   for the jury to decide whether the false assertions in

24   concealing the true ownership interests in each A1C Pharmacy

25   would have affected the PBM's decision to contract with the

Motion Hearing - September 10, 2020

1    A1C Pharmacies.  And the answer to this question tends to

2    prove materiality of the scheme and the defendants' intent

3    in submitting medically unnecessary prescriptions for

4    Lidocaine as well as --

5        (Reporter seeks clarification of the record.)

6            MS. DUBAL:  -- diabetic testing supplies.

7            And I apologize.  I will talk slower.  I apologize

8    for that.

9            In terms of any vagueness argument that's made, the

10   vagueness argument that is made with regard to classifying

11   the pharmacies as mail order versus retail, again, your Honor,

12   this is -- you know, the Government is required to prove

13   beyond a reasonable doubt that the defendants acted knowingly

14   and willfully to defraud the PBMs as well as Medicare, which

15   requires the Government to prove that by deceiving the PBMs in

16   contracting with the pharmacies, concealing their ownership

17   and misclassifying the pharmacies, that they were actually

18   able to further the scheme to defraud by distributing these

19   medically unnecessary medications and diabetic testing

20   supplies and thereby their -- the submission of the false

21   claims was knowing and intentional.

22           The defendants are free to argue at trial that

23   mail order -- classification of mail order versus retail was

24   confusing.  They are free to argue that at trial during cross

25   examination, and then the jury can decide what weight to give

1   this evidence as it pertains to the defendants' intent in

2   committing this crime.

3          And then in terms of the arguments pertaining to test

4   claims and the use of test claims, the use of test claims in

5   this case is not the object of this conspiracy.  The object of

6   this conspiracy was to defraud the Medicare program so that

7   the defendants could actually obtain money, which is clearly

8   detailed in the indictment.  It was -- the use of these test

9   claims is one of the many steps that the defendants took to

10  execute this scheme to defraud, and it's not an issue of law

11  for the Court to decide at this time.

12         And then lastly, in terms of the defendants'

13  arguments pertaining to auto refills as well as the patient

14  transfer program being civil violations that are not criminal,

15  the United States has followed the Justice Manual guidelines

16  in charging this case as a criminal violation, and the

17  defendants are not being charged with healthcare fraud as a

18  result of the civil -- any type of civil violations.

19         The auto refill program and the practice of patient

20  transfers is circumstantial evidence of the defendants' intent

21  and proves the materiality of the fraudulent scheme in

22  perpetrating this fraud.

23         And this was, again, one of the many steps the

24  defendants took to perpetrate this fraud.  The weight to give

25  that evidence is for the jury to decide.

```
 1            And so, your Honor, for all of those reasons the
 2   defendant -- the United States would ask that you -- that this
 3   Court deny the defendants' motion to dismiss Count 1 of the
 4   conspiracy.
 5            THE COURT:  Thank you, Ms. Dubal.
 6            Mr. Eppel, any rebuttal?
 7            You're muted, sir.
 8            MR. EPPEL:  I apologize.  Nothing to add, your Honor.
 9            THE COURT:  Very well.  And would anybody else like
10   to be heard?  If so, raise your hand.
11            And no hands are raised.
12            Thank you.
13            The motion is presented under Rule 12 of the Federal
14   Rules of Criminal Procedure, specifically Rule 12(b)(3)(B)(v),
15   and the challenge is whether the indictment, that is, Count 1
16   of the indictment adequately states an offense.
17            The indictment, it's well known, states an offense if
18   it contains the elements of the offense charged; and secondly,
19   fairly informs the defendant of the charge against which he
20   must defend; and third, enables him to plead an acquittal of
21   conviction in bar of future prosecutions for the same offense.
22            The indictment in this case charges essentially
23   conspiracy in Count 1.  Let me read the exact label.
24   "Conspiracy to commit healthcare fraud and wire fraud."
25            And the indictment proceeds through paragraphs 24 and
```

1    following, incorporating paragraphs 1 through 23 to describe

2    the manner and means of the alleged conspiracy.

3        The defendant makes essentially four arguments that

4    the Government has failed -- or the grand jury has failed to

5    set out a crime under Section 1349 of Title 18 in the various

6    paragraphs in Count 1 of the indictment.

7        The one principle that perhaps governs the decision

8    in this motion is that courts, when evaluating a motion to

9    dismiss based upon the sufficiency of a charge in the

10   indictment -- in an indictment -- do not evaluate the evidence

11   upon which the indictment is based.

12       The elements of healthcare fraud are, first -- I'm

13   sorry -- the elements of conspiracy to commit healthcare fraud

14   are, first, an agreement between two or more persons; and

15   secondly, knowingly and willfully to execute or attempt to

16   execute a scheme or artifice to defraud any healthcare benefit

17   program or obtain by means of false or fraudulent pretenses,

18   representations, or promises any of the money or property

19   owned by or under the custody or control of a healthcare

20   benefit program in connection with the delivery of or payment

21   for healthcare benefits, items, or services.

22       An indictment will usually be sufficient if it states

23   the offense using the words of the statute itself as long as

24   the statute fully and unambiguously states all of the elements

25   of the offense.  Here the indictment tracks the statutory

1    language verbatim, framing both a specific factual background

2    of the alleged fraudulent transactions and the rough date

3    range of the scheme.

4         Courts have repeatedly held that charges of

5    healthcare fraud conspiracy are adequate when the indictment

6    alleges the time frame of the scheme, identifies the

7    perpetrators of the alleged victims, and charges that the

8    defendants submitted claims for services or items that were

9    medically unnecessary.

10        The indictment here alleges that the defendants

11   engaged in a scheme between the end of 2013 and the end of

12   2018 to submit claims to pharmacy benefit managers for refills

13   of medically unnecessary prescription drugs and diabetic

14   testing supplies purportedly for beneficiaries who never asked

15   for them and some of whom were deceased.

16        The Government also recites numerous other details

17   of the factual background of the scheme, including the

18   defendants' deceptive representations about other

19   circumstances, such as the alleged concealment of Defendant

20   Letko's ownership of -- ownership positions in pharmacies

21   which, had the benefit program known about, would have caused

22   them to decline any dealings with the entities due to his past

23   involvement in other fraudulent conduct.

24        Those circumstances, whether or not per se unlawful,

25   are relevant to prove the defendants' intent to carry out a

1    fraudulent scheme, since they evidence a willingness to engage
2    in several forms of misrepresentations and obfuscation in the
3    course of their operations.
4         But the principle proofs of the criminal fraud
5    charged in the indictment presumably will come from the
6    voluminous records of benefits claims that the Government has
7    produced in discovery, many of which allegedly were for
8    medically unnecessary prescription items.
9         The evidence of lack of patient consents similarly
10   will be offered to bolster the showing that the items were
11   medically unnecessary, a conclusion that obviously is rendered
12   more credible by evidence that the recipients never asked for
13   the items, and in some cases were persuaded to accept them and
14   not return them only by the improper waiver of co-payments by
15   the defendants.
16        The lack of any medical necessity also certainly
17   would be supported by proofs that, in some cases, the
18   purported recipients were deceased, and therefore, could have
19   no conceivable medical use for any items delivered by the
20   defendants.
21        And then, lastly, the defendants' arguments bearing
22   primarily on whether certain specific conduct alluded to in
23   the indictment may comprise legally sufficient proof of
24   fraudulent conduct do not supply any proper ground for
25   pretrial dismissal of a charge that otherwise was adequately

1    pleaded.

2           So with respect, the Court will deny the motion to

3    dismiss Count 1 of the indictment, which is Docket Number 84.

4           I see that Mr. McCormack has joined us.  In that

5    case, we will turn to Defendant Letko's motion to compel

6    disclosure of the Brady materials, Docket Number 82.

7           And so, Mr. Donnini, I think that is your motion to

8    argue; is that correct?

9           MR. DONINNI:  Yes, your Honor.  Thank you.

10          THE COURT:  You may proceed.

11          MR. DONINNI:  Sure.

12          Before I do, I know that Susan said you were going to

13   take a break at 2:30.  It's 2:32.  Is that no longer an issue?

14          THE COURT:  Well, it might be.  Can you just stand by

15   for one second and I can tell you?

16          MR. DONINNI:  Yes, sir.

17      (Recess taken from 2:32 p.m. to 2:37 p.m.)

18          THE COURT:  Counsel, I'm sorry for the delay.

19   I appreciate your accommodation.

20          Mr. Donnini, go ahead on the motion to compel

21   disclosure of Brady materials, please.

22          Are you ready to proceed?

23          MR. DONINNI:  Yes, sir.  Thank you, your Honor.

24          THE COURT:  Okay.

25          MR. DONINNI:  So, your Honor, this motion essentially

1    asks for two things.

2          One is disclosure, identifying and disclosing to us

3    Brady materials within the non-produced material -- and that's

4    important -- the non-produced items that have not been

5    produced to the defense.

6          THE COURT:  Okay.  What do you characterize as

7    non-produced materials?

8          MR. DONINNI:  So basically that falls into, in my

9    mind, two categories, your Honor.  One is the category of

10   documents that have been made available for inspection here

11   in Detroit, as well as in New York and New Jersey, is my

12   understanding.  So that's one category.  The second category

13   is anything else that the Government has possession, custody,

14   and control over.

15         And, importantly, I don't define the Government as

16   Ms. Dubal and Mr. McCormack; I define the Government as the

17   Government.  And the Government here, not only is there an

18   Eastern District of Michigan investigation, but there was a

19   District of New Jersey investigation, a District of Georgia

20   investigation.  And they all seem to be coordinated efforts,

21   because many of those search warrants that were executed

22   across the country happened on the same day, May 4, 2017.

23         THE COURT:  Okay.  Let's back up a couple of steps,

24   please, Mr. Donnini.

25         The items made available in Detroit are made

1    available in Detroit.  You don't characterize that as

2    non-produced items, do you?

3            MR. DONINNI:  I do categorize it as non-produced

4    because it's -- first of all, I would say that we have -- as

5    the Government puts in their response, so far we have received

6    and produced to us ten different productions -- I think an

7    eleventh came in yesterday -- totaling well in excess of

8    2.1 million pages of materials, so we have plenty to sift

9    through in the materials that have been produced to us.

10   Again, our motion has nothing to do with that.

11           THE COURT:  And you're saying there are -- are there

12   other items in Detroit lodged somewhere here that have not

13   been turned over to you or made available for you to look at?

14           MR. DONINNI:  They're made available for us to

15   inspect.

16           THE COURT:  So if they haven't turned it over to you

17   via some digital production but made it available for you to

18   look at in Detroit, are you characterizing something like that

19   as non-produced items?

20           MR. DONINNI:  I am, your Honor.

21           THE COURT:  All right.  And so much the more so for

22   the New York and New Jersey lodged materials?

23           MR. DONINNI:  Yes, your Honor.

24           THE COURT:  All right.

25           MR. DONINNI:  And I don't know how much detail you

Motion Hearing - September 10, 2020                                    24

1    want me to go into, your Honor, but in terms of the items in

2    Detroit we have boxes of materials and we now know 137 boxes

3    from what was seized at AAMS, All-American Medical Supplies in

4    Miramar, Florida.  We have an additional 67 boxes of materials

5    that were seized from AMP, the Warren, Michigan pharmacy here,

6    which is one of the A1C Pharmacies which is the most, I think,

7    prevalent in this, in the indictment.  So that's the hard-copy

8    stuff.

9              But it's not limited to that, your Honor.  We have

10   got call center recordings of unknown volume, and we have

11   electronic evidence that I frankly don't have any handle on.

12   Maybe I missed something in the letters and in the response

13   from the Government, but the electronic evidence that is

14   available for inspection, I don't have a handle on what that

15   is and how much that entails.

16             So as far as I'm concerned, just in Detroit, what's

17   available for inspection is a great volume of materials.  And

18   again, that's in addition to the over 2.1 million pages worth

19   of materials that we have that we're working through to the

20   best of our ability.  You know, we've had some problems

21   ingesting that.  I'm not going to waste the Court's time with

22   that, but that's got to be our first focus.  And so we have

23   not made arrangements yet to even go look at this stuff that's

24   available for inspection.

25             Obviously, the pandemic has added to those

1    complications, but even if there weren't a pandemic, we would

2    focus on what has been given to us first.  But all this other

3    stuff that's just been made available for inspection, our

4    position is, the Government, if it knows of Brady within

5    those materials or will become aware of Brady within those

6    materials, they shouldn't be able to abdicate their

7    responsibility by simply saying it's available for inspection.

8           THE COURT:  So do you intend to look at this material

9    in Detroit?

10          MR. DONINNI:  Yes, we do, your Honor.  We just

11   haven't gotten to that point yet.

12          THE COURT:  All right.  Continue with your argument.

13          MR. DONINNI:  Sure.

14          So, I mean, largely that covers the -- much of what I

15   was going to have prepared, and I just think that we're not --

16   as the Government says in their -- on their response brief,

17   that we're trying to absolve ourselves of our responsibility

18   to prepare and that we're trying -- we're asking them to sift

19   through the evidence to locate anything favorable to the

20   defense.

21          Again, I know I'm repeating myself, but we're not

22   asking them to do anything with respect to what they have

23   given us.  We know our obligations.  We're going through those

24   materials as best we can.  It's the things that are not

25   immediately available to us even in Detroit.  It's close, but

1    we do have some limitations on being able to go see it even

2    now.

3             THE COURT:  Such as?

4             MR. DONINNI:  Much the harder to go to New York or

5    New Jersey.

6             THE COURT:  Yeah.  Let's just focus on Detroit for a

7    minute.

8             What are your limitations in being able to go inspect

9    those items?

10            MR. DONINNI:  Well, your Honor, again, I said before

11   and I'll say it again, I think that we wouldn't even be to

12   that point.  While the pandemic has certainly slowed down our

13   efficiency and our ability to get things done as we would in

14   normal terms, but, you know, just getting -- whether it's one

15   or two of us, I have not coordinated logistics.

16            Are we going to be in there with another agent?  Are

17   we going to be sitting there with masks on all together in a

18   room?  Does the room have windows?  I'm assuming it doesn't.

19   I'm assuming, you know, we're going to be in the basement of a

20   building somewhere.  And, you know, there's just -- is it

21   going to be one person from our team?  Are we going to have

22   multiple people?  These are things we have to think through,

23   but -- you know, we can get it done, but again, with all

24   that's going on on that front, we have put that to the side

25   for now.

1      THE COURT:  Well, sooner or later I would think to

2   prepare you're going to want to spend time with these

3   documents and look through them, aren't you?

4      MR. DONINNI:  Yes, your Honor.

5      THE COURT:  And so I would suggest that sooner would

6   be a better watchword here in terms of making a plan.  Now,

7   you know, the law is pretty clear that the Government is not

8   required to curate this material and give you the good stuff.

9      Of course, if something is obviously exculpatory, the

10  Government has an obligation to point it out, I suppose.  But,

11  you know, sometimes beauty is in the eye of the beholder and

12  what the Government -- what you might think is exculpatory,

13  the Government might disagree with.  So I think that the cases

14  are -- point out the dicy nature of an order that requires the

15  Government to just require -- just turn over material that's

16  exculpatory, and that obligation can be satisfied by turning

17  over what the Government has so you can examine it for

18  yourself.

19      Certainly they can't withhold anything, but -- and I

20  understand in a documents case that's heavily ladened like

21  this, it's quite burdensome, but that -- the inspection

22  process is really a function of time and resources; right?

23      MR. DONINNI:  Yes, your Honor.  And I agree with you,

24  we need to turn to that again.  We have lots to do with what

25  has actually been produced to us, but we do intend to turn to

Motion Hearing - September 10, 2020                    28

1    those materials that are only available for inspection.

2             I guess the only point I would add is, I agree

3    that -- let's assume the Government is aware of materials that

4    are -- would fall under Brady within documents that have only

5    been made available for inspection or not yet made available

6    for inspection.  I don't think their obligation is satisfied

7    by merely saying, "Here's the treasure trove of materials,"

8    137 boxes, 67 boxes, 43 boxes, and an unknown number of

9    electronic documents, and say, "Have at it."  I think their

10   obligation, if they know or become aware, is greater than just

11   simply making it available for inspection.

12            THE COURT:  Do you have a case that says that?

13            MR. DONINNI:  Your Honor, I am more relying on logic

14   and what I think is appropriate.  I do think that the cases

15   we cited in our brief support that position, but something

16   specific as to that, no, your Honor.

17            THE COURT:  Well, people that don't have cases

18   usually turn to logic.

19            MR. DONINNI:  Sometimes logic makes sense, and

20   fairness.

21            THE COURT:  Well, no, I'm a proponent of logic, but

22   it's more helpful to make a decision with a case.

23            MR. DONINNI:  Understood, your Honor.

24            THE COURT:  All right, Mr. Donnini.

25            What's the situation about New Jersey and New York?

1          MR. DONINNI:  Well, again, your Honor, with that,

2    that is -- those -- it's my understanding those are the

3    documents that were seized in connection with the, I'll call

4    it, parallel or coordinated New Jersey investigation.  And I

5    believe -- and the Government will certainly correct me if I'm

6    wrong -- I believe that investigation is more focused on Jim

7    Letko's brother and not Mr. Letko in this case specifically;

8    however, there may be materials within that investigation that

9    may have important information for us.  So again --

10         THE COURT:  This is the New Jersey compilation?

11         MR. DONINNI:  Yes, your Honor.

12         THE COURT:  All right.  Are those electronic

13   documents or paper documents?

14         MR. DONINNI:  My understanding is, there are 43 boxes

15   of paper documents, an unknown quantity of electronic

16   evidence -- and I put that in quotes because that's what

17   I read in the Government's response -- and then a data

18   center that hosted e-mails for various entities related to

19   Mr. Letko's brother.

20         THE COURT:  The data center is in New York, though;

21   right?

22         MR. DONINNI:  The data center is in New York.  The

23   electronic evidence, I believe, is in New York.  The hard copy

24   documents are in either Edison or Bridgewater, New Jersey.

25         THE COURT:  In some agency office?

```
 1              MR. DONINNI:  I believe so, your Honor.
 2              THE COURT:  All right.  Anything else, Mr. Donnini?
 3              MR. DONINNI:  Not on that, your Honor.  However, I
 4    would like to make a few comments on the agent notes.
 5              THE COURT:  Oh, yeah.  Okay.  Go ahead.
 6              MR. DONINNI:  So on this -- and I'll be brief -- the
 7    Government here has already agreed to preserve the agents'
 8    rough notes.  And they stated in their brief that to the
 9    extent that they become aware of Brady, exculpatory evidence
10    within rough notes, it will be produced.
11              And then another argument they make in their brief is
12    that it's the Government that gets to decide which information
13    must be disclosed and the prosecutor's decision on disclosure
14    is final.
15              Okay.  So putting those, all those together, the
16    problem with that is that if the Government who has access to
17    these handwritten notes never looks at them, there is never
18    going to be anything that's disclosed to us that may be in
19    those handwritten notes.
20              So I understand the case law that says if the 302
21    exists then there is no violation if the handwritten notes are
22    destroyed, but here we have a situation where the handwritten
23    notes are being preserved.
24              And so what we're asking is, we will do the work.
25    We want to look through the 302s and the handwritten notes,
```

1    because obviously a witness interview that the Government

2    conducts is not the witness's statement, but the handwritten

3    notes are something that are contemporaneous to the interview.

4         The 302 is something that the agent creates after the

5    interview itself.  And he or she may bring other aspects,

6    other knowledge of the case into that memo-writing process

7    that may very well not be there when they are sitting in the

8    room with the witness.  So, in my opinion, the handwritten

9    notes are a better reflection.  Again, they are not witness's

10   statements, necessarily, but they are a better reflection of

11   what took place in that room than potentially the 302.  And I

12   think that it's -- again, whether we want to call it logical

13   or common sense, that it makes sense for us to be able to see

14   that, to compare it, and to determine for ourselves whether

15   there may be Brady that's within those materials.

16        And in our reply, between the time of the filing of

17   our motion and the filing of our reply, we did receive the

18   handwritten notes from the interviews of the co-defendants in

19   this case, and we did point out just a couple of instances

20   from Mr. Lazeki's 302 and handwritten notes where we showed

21   one instance where something was added to the 302 which, in

22   our opinion, was more favorable to the Government -- so it

23   wasn't in the notes, but it was in the 302, and it was more

24   favorable to the Government -- and another instance where

25   something was in the notes but excluded from the 302 which was

1   actually favorable to the defense.

2           So these may not be earth-shattering instances of

3   discrepancies, but it is an area where we believe we should be

4   able to see those materials in order to test what happened

5   when those individuals were interviewed by the Government.

6   And we believe that the Government should produce those

7   handwritten notes because they have been preserved, because

8   they exist, presumably, for all witnesses that the Government

9   intends to call at trial.

10          THE COURT:  Okay.  Anything else, Mr. Donnini, on

11  this Docket Number 82?

12          MR. DONINNI:  No, your Honor.  Thank you very much.

13          THE COURT:  Ms. Webster, anything on this motion?

14          MS. WEBSTER:  Nothing further.  Thank you, your

15  Honor.

16          THE COURT:  Mr. Burdick?

17          MR. BURDICK:  No, sir.  Thank you.

18          THE COURT:  Mr. LaRene?

19          You're muted, so I --

20          MR. LaRENE:  Thank you.  No.

21          THE COURT:  Thank you.

22          And Mr. Berman?

23          MR. BERMAN:  No, your Honor.  Thank you.

24          THE COURT:  Thank you.

25          Mr. McCormack, good afternoon.

1          MR. McCORMACK:   Thank you, your Honor.

2          First I want to apologize to the Court and counsel.

3   I'm sorry for the technical issues I experienced logging on.

4   Your staff was able to help me get through it.  So again, I'm

5   sorry, your Honor, for wasting your time earlier today.

6          So I would like to just first update the Court, kind

7   of clarify the record in terms of what is where with respect

8   to the non-produced items, the items that have been made

9   available for inspection.

10         In Detroit, your Honor, there's 76 boxes from

11  Florida.  There was an error in the Government's motion citing

12  137, but it's actually 76 boxes from Florida, 67 boxes that

13  were seized pursuant to a search warrant in Michigan, and then

14  additionally there's -- the electronic evidence solely

15  consists of the telephonic recordings which the Government

16  obtained from the defendants' VICIbox server.  It took some

17  time, but that was uploaded to a computer at HHS here in --

18  there in Detroit.  I'm sorry, I'm not there, your Honor.

19         And that server was ultimately returned back to the

20  defendants, so the defendants have access to the VICIbox

21  server right now, so they could listen to those recordings

22  without having to go to the Detroit HHS to review those.

23         With respect to the --

24         THE COURT:  Who has custody of that?

25         MR. McCORMACK:  Your Honor, I'm not sure who it was

Motion Hearing - September 10, 2020                    34

1    returned to.  I know it was returned in June of 2017.  I'm not

2    sure where it stands today amongst the co-defendants or with

3    the company, your Honor.

4              THE COURT:  Hmm.  Mr. Donnini, are you aware of that?

5              MR. DONINNI:  Your Honor, I'll have to inquire.  I

6    did hear that.  I don't know if the company has it.  You know,

7    obviously the company is not what it once was, but I will

8    certainly chase that down, because if I can access the audio

9    recordings not having to sit at a standalone computer station

10   at the Government's offices, I intend to do that.

11             THE COURT:  Okay.  Thank you.

12             Mr. McCormack, how are those audio recordings stored

13   in the Government's possession?

14             MR. McCORMACK:  They are stored on a computer, your

15   Honor.  The Government had to subscribe to VICIdial, which is

16   the software platform that uses VICIbox, and then you can sort

17   through the recordings by date, by the phone number, even by a

18   campaign like, for example, "Lidocaine campaign," and one can

19   sort through the phone calls to find pertinent details, if,

20   for example, you're looking for a specific phone call with an

21   identified patient, your Honor.  And they are in Detroit HHS

22   OIG on a standalone computer, your Honor, right now.

23             THE COURT:  So that database could be replicated and

24   turned over?

25             MR. McCORMACK:  It could not, your Honor.  It

```
 1    requires the software, which I indicated we had to subscribe
 2    to.  It took us a number of months to even get it into a
 3    position where we could access it ourselves.  The best we were
 4    able to do is have it accessible on the standalone computer at
 5    the Detroit HHS office, your Honor.
 6            THE COURT:  Standalone computer meaning one that's
 7    not connected to the internet?
 8            MR. McCORMACK:  It's a computer.  The only thing
 9    that's on it, my understanding, your Honor, is the VICIdial
10    software with access to the recordings.
11            THE COURT:  Is that software proprietary?
12            MR. McCORMACK:  I believe so, your Honor.  Hence, we
13    had to -- we had to subscribe in order to get access.  And
14    like I said, it took months to actually upload the phone calls
15    so we were in a position to review them.
16            THE COURT:  All right.  So if you returned the raw
17    data to the defendant, the defendant might not even have
18    access to it without subscribing to the proprietary software;
19    is that correct?
20            MR. McCORMACK:  Well, your Honor, they already --
21    it's our understanding they already subscribed to it in order
22    to have the platform and to use it on their own, so they could
23    either resubscribe or maybe they're currently still subscribed
24    to the software; that, I don't know.  But I know at one point
25    they were subscribing to VICIdial.
```

1           THE COURT:  All right.  Go ahead.  What else?

2           MR. McCORMACK:  Thank you, your Honor.

3           With respect to New Jersey, there's 43 boxes.  That's

4   at the HHS OIG in Edison, New Jersey.  The Government is

5   currently exploring the possibility of having them transported

6   to Detroit on a temporary basis.  I was hoping to have an

7   answer on that by this hearing today, your Honor, and despite

8   my best efforts talking to peopling in New Jersey, I was not

9   able to get an update whether that's possible.

10          With respect to the data, your Honor, the data --

11          THE COURT:  Wait a minute.  What do you mean, if it's

12  possible or not?  What would be the problem?

13          MR. McCORMACK:  I just -- I think logistically,

14  potentially, your Honor -- I mean, we were able to ship

15  documents from Miami up to Detroit.  So as there is a -- that

16  investigation is ongoing, you know, and they are taking the

17  lead on it, we just wanted to connect with them to make sure

18  it's possible that we could do that.  And we're still, like I

19  said, awaiting word to see whether it is possible we could

20  transport them to Detroit to ease the review for at least

21  counsel for four of the five defendants.

22          THE COURT:  All right.  What else?

23          MR. McCORMACK:  With respect to the data in New York,

24  your Honor, so there is -- as defense counsel pointed out,

25  there is data that was seized from e-mails, an e-mail server

Motion Hearing - September 10, 2020                                    37

1    related to Defendant -- I'm sorry -- Defendant Letko's

2    brother, Jim Letko.  That data was, at one point, on a

3    Relativity database in New Jersey.

4            That Relativity database has been deactivated and the

5    data was taken off a server.  The District of New Jersey is in

6    the process of uploading that data to another server in an

7    effort to reactivate the Relativity database.  If that occurs,

8    we would be able to produce that to the defendants; however,

9    subject to a filter review would have to happen first, your

10   Honor.

11           And likewise, the data from Amazon Web Services that

12   was believed to be patient files and records relating to

13   prescriptions from Jim Letko's companies, that information is

14   in New York.  And my understanding, it has yet to be accessed

15   by anyone due to technical issues.  So they're still in the

16   process of trying to access those materials.

17           THE COURT:  So you're telling me you haven't even

18   been able to look at it; is that correct?

19           MR. McCORMACK:  Correct, your Honor.  The Government

20   in this case has not reviewed the New Jersey materials,

21   the hard copy, or the electronic information and -- or the

22   information that was seized pursuant to Mr. Letko's -- John

23   Letko's company that is being housed in New York.  That is

24   correct, your Honor, we have not been able to review any of

25   that so far.

1          THE COURT:  All right.

2          MR. McCORMACK:  And likewise, your Honor, the

3     Government's production is not unduly onerous.

4          As defendant -- as defense counsel indicated in its

5     reply, they tried to distinguish the production here from

6     that in Rorschach (phonetic) by making an argument that Brady

7     requires production as opposed to disclosure, and that is --

8     there is no case that they have cited that supports that

9     notion.  And, in fact, the Sixth Circuit said in Presser that

10    Brady requires disclosure of potentially exculpatory evidence.

11         And I wanted to draw the Court's attention to two

12    cases that were cited in the Government's pleadings in support

13    of that motion that Brady does not require production.  It can

14    also be met through access to disclosure.

15         And the first is U.S. v. Mmahat, which is spelled

16    M-m-a-h-a-t, for the record.  That is cited by both Government

17    and defense, in defense's reply brief.  And that was a

18    circumstance, your Honor, in the Fifth Circuit where the

19    Government gave access to half a million documents months

20    before trial to the defense, so did not produce them, merely

21    gave them access, and those records were indexed.

22         And after -- on appeal, your Honor, defense argued

23    that that was a Brady violation, a failure to identify what

24    was potentially exculpatory.  And there the Fifth Circuit said

25    essentially, as your Honor has indicated, there's no authority

1    for the proposition that the Government's Brady obligations

2    require it to point to specific documents that were turned

3    over.

4         And the other case, your Honor, is U.S. v. Pellulo,

5    which is P-e-l-l-u-l-o.  That's a case out of the Third

6    Circuit, your Honor, where materials were also provided to

7    defense for inspection.  In that circumstance the defendant

8    was indicted in Philadelphia, the defendant's principal place

9    of business was in Miami, and the Government provided access

10   to approximately 75,000 pounds of documents in Jacksonville,

11   Florida.

12        So, your Honor, assuming that a box of evidence is

13   approximately 50 pounds, that's approximately 1,500 boxes of

14   evidence that the defense was given access to.  The Government

15   produced a partial index of documents; however, the Government

16   even conceded that that index was obsolete.

17        However, on appeal, after the defense argued that was

18   in violation of Brady, that production and failure to identify

19   potentially exculpatory evidence, the Court noted that the

20   Government made the documents available to the defendant and

21   without specifying what was helpful to the defense, which is

22   something that Brady does not obligate it to do.

23        So, your Honor, for those reasons the Government

24   would ask that you would deny the defense request to identify

25   potential Brady materials in what has been made accessible

1      for review for the defense.

2              And then briefly, your Honor, with respect to agent

3      notes, it's clear in the Sixth Circuit that rough notes are

4      not discoverable as Jencks material, so that the defense is

5      essentially trying to argue that they are discoverable as

6      potential Brady material.  And as is indicated in our

7      pleading, your Honor, to the extent the Government is aware

8      of Brady information in the rough notes it will certainly be

9      produced.

10             But in support of their argument they cite two

11     examples, your Honor.  After the defense filed their motion to

12     compel Brady materials the Government produced approximately

13     38 pages of rough notes relating to interviews conducted with

14     the three co-defendants that made statements, and of those 38

15     pages defense cited two examples that they purport identify

16     potential Brady material.

17             The first is -- the first example with respect to a

18     statement by Mr. Lazeki regarding Jeffrey Roy Kolmer, that --

19     the report itself does not -- includes more than was indicated

20     in the notes.  That's not indicative of an inconsistency, your

21     Honor.  The whole purpose of notes during an interview are,

22     they are not verbatim transcripts of what was said, they are

23     merely supposed to help jog an agent's memory when they write

24     their report, and that's certainly what appears to have

25     happened in this circumstance.  So the absence of something in

1      the notes does not reflect an inconsistency.

2              And furthermore, the second example, your Honor, is

3      equally not persuasive.  It is -- essentially defense is

4      trying to characterize that as an omission.  So the omission

5      would be that -- an inference that All American Medical was

6      not conducting due diligence with respect to claims; however,

7      the report itself just a couple sentences before the portion

8      that's cited by the defense reads that pharmacists were

9      reviewing prescriptions to make sure that data was reviewed

10     quickly -- correctly, and that on many occasions the data

11     entry team picked the wrong doctors and Emily Lyons caught the

12     mistakes.  Certainly it doesn't say that they fixed it, but I

13     think it's implied by those sentences there, your Honor.  So

14     that is not -- another example, I think, that does not give

15     light, does not support the defendants' request.

16             So with respect to the agents' rough notes, your

17     Honor, there is simply no vehicle at this juncture to entitle

18     the defendants to the notes.

19             And for all those reasons, your Honor, the Government

20     asks that you deny the defendants' motion.

21             THE COURT:  Mr. McCormack, have you read the rough

22     notes?

23             MR. McCORMACK:  I have read the ones that have been

24     produced, your Honor, the defense -- regarding the defendants.

25             THE COURT:  Have you read the other ones?

```
 1              MR. McCORMACK:  I have not, your Honor.
 2              THE COURT:  Can you tell me how voluminous that
 3     collection is?
 4              MR. McCORMACK:  I am not in a position where I can
 5     answer that, your Honor, with respect to the notes that have
 6     been preserved.
 7              THE COURT:  You mean you're not in a position because
 8     you don't know?
 9              MR. McCORMACK:  Yes, your Honor.
10              THE COURT:  All right.
11              Mr. Donnini, anything further?
12              MR. DONINNI:  Your Honor, I'll stand on our brief and
13     stand on our argument previously made.  But thank you for the
14     opportunity.
15              THE COURT:  All right.  I'm concerned about the
16     materials in New York and New Jersey being made available.
17     I'm not going to require the defendants to go there to examine
18     them.  I will give the Government the option of either
19     producing the paper materials in New Jersey by transporting
20     them -- I'm sorry.  Let me say this more clearly.
21              I'll give the Government the option, with respect
22     to the materials now located in New Jersey, of either
23     transporting them to Detroit within the next 60 days to allow
24     the defendants to inspect them or the Government can inspect
25     them in New Jersey and identify any information that's
```

43

1    potentially exculpatory.  I presume the Government doesn't

2    want to have the burden of the latter option, and so I'll

3    expect that some arrangements will be made.

4         The burden is on the defendants, however, to make

5    arrangements to inspect the materials that are in Detroit

6    and made available to it, and however you do that, either with

7    an investigator or a paralegal or with some joint defense

8    agreement to handle it in some more expeditious way, you need

9    to get on that right away.

10        With respect to the rough notes, they have been

11   preserved.  The Government takes the position, it sounds like,

12   that they may be Jencks material.  And if that's the case,

13   I'll order them produced consistently with the Jencks Act, and

14   that is, after a witness testifies on direct examination those

15   materials will be produced before cross examination.

16        That could extend the timing of the trial quite a

17   bit, because I would give the defense an adequate amount of

18   time to review those things, and so perhaps an accommodation

19   can be made sometime closer to the trial date, but I will not

20   order them produced right now.

21        So to the extent that that relief is a partial grant

22   of the motion, it is so ordered.  But in all other respects,

23   the motion is denied.

24        Let's see.  The next one is a motion to strike

25   surplusage.  That's Docket Number 83.

1           And I think, Mr. Donnini, you said you were taking

2     that argument?

3           MR. DONINNI:  Yes, your Honor.  Thank you.

4           THE COURT:  Okay.  You may proceed.

5           MR. DONINNI:  Okay.  Your Honor, again, this is a

6     motion under Rule 7(d).  And what we have argued in our brief

7     is that both the indictment and the seizure affidavits that

8     came a couple years prior, we believe it's clear that the

9     Government's investigation is about Medicare Part D.

10          There are five references to diabetic testing

11    supplies in the indictment, paragraphs 33, 35, 37, 40, and 43.

12          And again, with Part D, the case is about the A1C

13    Pharmacies' relationship with private insurers and the PBMs

14    that the insurers contract with.

15          The Part B, Medicare Part B is different and that

16    covers durable medical equipment and diabetic testing

17    supplies, and that is where it's directly administered by

18    CMS or the Government, so there is billing directly to

19    the Government.

20          In essence, your Honor, we believe that introduction

21    of allegations of false and fraudulent diabetic testing

22    supplies, which is a Medicare Part B issue, is going to do

23    nothing but confuse the jury, waste time, and ought to be

24    excluded and stricken from this indictment because it has

25    nothing to do with the claims that were submitted for

1    prescriptions under the Medicare Part D program.

2          As we -- I think it's important, and I'm going to

3    just go ahead and read a sentence on page 1 of the response,

4    the Government's response, and this is how they lead their

5    argument.  They say:  "The defendants engaged in a massive

6    multi-pronged healthcare fraud scheme that involved dispensing

7    expensive medications such as Lidocaine and diabetic testing

8    supplies without patient consent resulting in over $80 million

9    worth of false and fraudulent claims being paid."

10         Your Honor, the argument that the Government really

11   makes, I think, and obviously they can speak for themselves,

12   is that, you know, there's two things going on, and I think

13   one is they talk about diabetes supplies, and we try to make

14   this point in the response, in the reply that, again, testing,

15   diabetic testing supplies are here in one category and

16   diabetes supplies such as these alcohol pads, that is

17   administered under Part D.

18         So it's a distinction worth noting and is important

19   because their secondary argument is that the jury needs to

20   hear about diabetic testing supplies under Part B for context

21   and background and how the A1C Pharmacies acquired their

22   patients and filled prescriptions for diabetic patients.

23         And again, I understand it.  The problem is, that's

24   something from our position that's created after the fact.

25   That is nowhere to be found in the indictment.  If you look

1    at the indictment, those five paragraphs that I articulated,

2    the -- those paragraphs, and I'm looking just at paragraph 33

3    to start, it says:  "Test claims" -- excuse me -- "Caused

4    the submission of false and fraudulent test claims using the

5    physician's MPI for expensive prescription medications and

6    diabetic testing supplies."  So -- and that's consistent in

7    35, and 37, and 40, and 43.

8          The allegations in the indictment are that false and

9    fraudulent claims for diabetic testing supplies are what's

10   alleged.  And what we're saying is that's Part B, that's not

11   Part D.  This case is Part D.

12         And so -- and to be frank, your Honor, you know, I

13   had to learn that, and it took me a while to figure it out,

14   and I do believe that this is something that is unnecessary in

15   this trial, is going to cause confusion, and frankly, ought to

16   be stricken from the indictment because that's what it will

17   accomplish.

18         You know, the Government -- and then I'll just point

19   out one other thing about the Government's argument.  The

20   Government says in their brief that a motion to strike should

21   only be granted when it is clear that the language is both

22   irrelevant and prejudicial.  But then on the next page, and

23   they are quoting a case, but on the next page they say a

24   prejudice determination is no part of the Rule 7 analysis,

25   and 403 balancing should be conducted during the trial.

```
 1              I mean, in my mind, your Honor, those two really
 2     can't coexist, because if a test under Rule 7 -- whether
 3     you're going to grant a motion to strike is whether it's
 4     irrelevant -- excuse me -- irrelevant and prejudicial, but
 5     prejudice is not part of the analysis, then a motion to strike
 6     would never be granted upon a pretrial basis, and that can't
 7     be correct.
 8              So, again, we believe that there are, again, the --
 9     and I -- it's in there, I just think it's important, diabetic
10     testing supplies, examples of that are monitors and testing
11     strips and these lancets.  Diabetes supplies, which is in the
12     Counts 2 through 6 of the indictment, alcohol pads, alcohol
13     pads are just supplies that help with the prescription.  Okay?
14     So they kind of go hand in hand with the prescription and
15     they are part of Part D, but diabetic testing supplies are
16     a different animal altogether.  It introduces a totally
17     separate method of how providers are reimbursed, again,
18     directly from the Government, whereas, Part D has this, I'll
19     call it, more complex structure of a pharmacy who contracts
20     with a PBM, who contracts with a private insurer, who
21     contracts with the Government.  And it's just a different
22     animal.  We believe that's why references to diabetic testing
23     supplies should be stricken.
24              THE COURT:  All right.  Thank you, Mr. Donnini.
25              Ms. Dubal, are you taking this one or Mr. McCormack?
```

```
 1              MS. DUBAL:  I am, your Honor.

 2              THE COURT:  All right.  You may proceed.

 3              MS. DUBAL:  Thank you, your Honor.

 4         Your Honor, again, you know, the defendant doesn't

 5    raise any issues, any new issues that weren't already raised

 6    in their initial motion, so the United States is going to

 7    primarily rely on its response; however, I will just highlight

 8    a few points, and I will address -- just actually, your Honor,

 9    I will address one issue that was raised in the defendants'

10    reply related to an argument that they made on the U.S. v.

11    Buck.  That's B-u-c-k.

12              So as is stated in the Government's response, your

13    Honor, the reference to diabetic testing supplies is relevant

14    because it does provide the necessary background to the jury

15    to understand how this whole scheme at A1C Pharmacies work

16    and how --

17              THE COURT:  I don't know, Ms. Dubal, if the court

18    reporter is having the same trouble, but it sounds like your

19    voice is dropping off and it makes it difficult to hear.

20              MS. DUBAL:  Oh.

21              THE COURT:  It could be my --

22              MS. DUBAL:  I apologize.

23              THE COURT:  -- equipment or it could be yours, but

24    I'm going to ask you to try to keep your voice up, please.

25              MS. DUBAL:  Absolutely, your Honor.  Thank you for
```

1     letting me know.  I apologize for that.

2            Ms. Twedt, are you having any issues -- are you

3     having issues with that as well?

4        (Discussion held off the record.)

5            MS. DUBAL:  Okay.  Thank you.

6            So, your Honor, as I was saying, that the reference

7     to diabetic testing supplies is relevant and evidence related

8     to -- you know, the diabetic testing supplies would be subject

9     to proof at trial, and so under the case law it cannot be

10    considered as surplusage.

11           And really, the crux of the issue here for the

12    defendant is that they are taking issue with the

13    characterization of diabetic testing supplies, and quite

14    frankly, the case law does not support striking language from

15    an indictment or excluding any mention of such a thing on this

16    basis.  And quite frankly, defendant cites no case law to

17    support this proposition related to the characterization of

18    diabetic testing supplies.

19           And so an attempt by the defendants to litigate the

20    truth of the allegations of the indictment at pretrial, that's

21    exactly what is happening here.

22           Now, in the defendants' reply they again argue that

23    the Government is trying to expand the scope of the alleged

24    crimes by stating that because the diabetic testing supply

25    claims by law cannot be submitted for reimbursement under

1          the Medicare Part B program is irrelevant.  And again, their

2          issue pertains to the characterization.  They're making --

3          they are trying -- defendant is trying to make a distinction

4          between diabetic testing supplies and diabetic supplies,

5          alcohol pads, which are used to test for diabetes, and that's

6          a supply that's used to test for diabetes versus diabetic

7          testing supplies.  And these are all issues that should be --

8          that can be raised at trial and not an issue for this Court.

9                    The defendant also relies on United States v. Buck,

10         that's B-u-c-k.  In citing this case the defendants attempt

11         to argue that reference to diabetic testing supplies will

12         inflame the jury into believing that the defendants committed

13         more crimes than was actually charged in the indictment;

14         however, unlike Buck, there is no inflammatory language in

15         the indictment with regard to reference to diabetic testing

16         supplies.

17                    "Diabetic testing supplies" is an innocuous term to

18         describe supplies that are used when testing insulin levels

19         for diabetes.  There is no risk that the jury will convict

20         any of the defendants for committing crimes under the Part B

21         program, since that's not what's alleged.  That's not what the

22         defendants are charged with.  And as the defendants themselves

23         acknowledge, there is no reference to the prepping program in

24         the indictment.

25                    In addition, the Government does not intend on

1    introducing evidence that the defendant did commit any crimes

2    under the Medicare Part B program, and mere reference to

3    diabetic testing supplies in the indictment will not

4    automatically inflame the jury into believing that they

5    have committed more crimes than what is actually alleged.

6           In Count 1, a reference to -- reference is made to

7    diabetic testing supplies to provide context and background

8    as it relates to how the conspiracy was executed.

9           And as to Counts 2 through 6 which incorporates

10   language from Count 1 by reference, Defendant Lazeki is

11   actually charged with submitting claims for diabetic testing

12   supplies.  Reference to diabetic testing supplies is relevant

13   to the Government's case-in-chief and would be subject to

14   proof at trial.

15          And so for all those reasons, your Honor, the United

16   States would respectfully request that this Court deny the

17   defendants' motion.

18          THE COURT:  Thank you, Ms. Dubal.

19          Mr. Donnini, before I ask for any rebuttal, I

20   neglected to ask any other of the attorneys for the defendants

21   if they wished to weigh in on this motion to strike

22   surplusage.  So let me just run down that so I can make

23   that inquiry for the record.

24          Ms. Webster, on behalf of Mr. King, do you have

25   anything to add?

```
 1              MS. WEBSTER:  I don't.  Thank you, your Honor.

 2              THE COURT:  Thank you.

 3              And Mr. Burdick?

 4              MR. BURDICK:  No, sir.

 5              THE COURT:  And Mr. LaRene?

 6              MR. LaRENE:  Thank you.  No.

 7              THE COURT:  Thank you.

 8              And finally, Mr. Berman?

 9              MR. BERMAN:  No, your Honor.  Thank you.

10              THE COURT:  All right.  Thank you.

11              Mr. Donnini, any rebuttal?

12              MR. DONINNI:  Yeah.  Briefly, your Honor.

13              So, again, Ms. Dubal said that essentially that's not

14      what's alleged, that reimbursement under Part B is not what's

15      alleged.  And my problem with that is that diabetic testing

16      supplies are reimbursable under Part B, and there are five

17      instances in the indictment which say "false and fraudulent

18      claims for diabetic testing supplies."  So if this case is not

19      about Part B, I'm not sure how I reconcile that, and that's

20      my -- that's my difficulty here.

21              I don't want to steal Mr. Berman's thunder here in

22      his motion for a bill of particulars, but the sentence that

23      I read earlier on page 1 of the Government's response where

24      it says, you know, "a massive multi-pronged healthcare fraud

25      scheme where" -- "involving dispensing expensive medications
```

 1    such as Lidocaine and diabetic testing supplies resulting in
 2    over $80 million worth of false and fraudulent claims," again,
 3    I'll only mention it because I know he is going to handle
 4    this, but we don't know what claims.
 5            So not only do we not know what Lidocaine claims, but
 6    we don't know what portion of that might involve diabetic
 7    testing supplies that are reimbursable under Part B.  So I
 8    think that that's a lead-in to the motion for a bill of
 9    particulars, but we're left kind of scratching our heads with,
10    what claims are we defending?  And if this isn't about claims
11    for diabetic testing supplies under Part B, my read of the
12    indictment is, that's what the indictment says.  It doesn't
13    say that diabetic testing supplies are -- are for background
14    and for how they acquired patients, et cetera.
15            Thank you.
16            THE COURT:  All right.  The motion to strike
17    surplusage is one that is authorized under Rule 7(d) of
18    the Federal Rules of Criminal Procedure; however, I think
19    everybody acknowledges that these motions are rarely granted.
20    They are appropriately granted, however, when the language in
21    the indictment is information that is plainly irrelevant and
22    prejudicial -- a prejudicial assessment or an assessment of
23    prejudice, better stated, is pertinent and not impertinent to
24    the consideration of such a motion.
25            But that having been said leads to the rhetorical

1    question of how an item which might be a legal non sequitur

2    included in an indictment can be prejudicial.

3            It's not my practice to read the indictment to the

4    jury.  I summarize it and don't permit anybody else to read it

5    to the jury.  And certainly the indictment is not submitted to

6    the jury as evidence, because the indictment is not evidence

7    in the case.

8            The question, then, is whether or not the information

9    that's recited in the indictment is irrelevant and ought to be

10   excluded at trial, which really is an evidentiary question,

11   and it's one that's properly or more properly assessed in the

12   context of the proofs as they are presented.

13           This motion here does not present the rare exception

14   that the information alleged to be surplusage should be

15   stricken.  And the Government, I think, credibly asserts that

16   the defendants' attempt to characterize some items they

17   supplied as diabetic testing supplies not covered by Medicare

18   Part D poses a factual issue that is subject to proof and

19   argument at trial.

20           The Government has explained in its response that it

21   intends to prove that the defendants' scheme included, as a

22   component, the conversion of patients from coverage under

23   Part B to Part D, which is relevant to help the jury

24   understand the background, means and ends of the criminal

25   conspiracy.

1          Regardless of the particular regulations under

2    which the specific dispensations might have been regulated,

3    information that's offered to complete the context or

4    background of a conspiracy is relevant, and consequently,

5    properly chargeable in an indictment even if it concerns

6    nominally unregulated or lawful acts which are offered to

7    explain the overall context of the conspiracy scheme itself.

8          The preamble of the indictment refers to Medicare

9    Part D in sections describing the overall background of the

10   criminal scheme, but the charging sections are unspecific and

11   the allegations of healthcare and wire fraud are not expressly

12   premised on the violation of any particular regulation, but

13   instead anchored by the more general allegation that the

14   defendant submitted numerous claims for medically unnecessary

15   items and services, alleging in an exemplary fashion that

16   those items include such things as prescription drugs,

17   diabetic testing supplies, which are neither needed nor

18   requested by the purported recipients.

19         So despite the defendants' position that the case is

20   only about Medicare Part D, the indictment itself betrays no

21   express limitation in that regard in the charges, in the

22   charging of the scheme to defraud.

23         So with respect, the motion to strike surplusage is

24   denied.

25         Going on, then, to the motion for bill of

1    particulars, Mr. Berman, I think Mr. Donnini did his best to

2    tee that one up for you, so you may proceed.

3            MR. BERMAN:  Thank you, your Honor.  And it is always

4    very helpful to follow Mr. Donnini.

5            The motion I filed for a bill of particulars has been

6    touched on by the argument the Court has heard so far today,

7    the importance of the motion for the bill of particulars.

8    It's been extensively briefed in my brief and the Government's

9    brief, and I don't mean to take up too much of the Court's

10   time by repeating arguments that it seems clear the Court is

11   familiar with.

12           But I would say just generally, we have asked for

13   the Court to order the Government to provide us with two types

14   of particulars.  One, the identity of other conspirators,

15   co-conspirators; and also, particulars relating to the

16   specific false -- allegedly false claims for payment that

17   the Government alleges were submitted.

18           To take it in that order, the identities -- the

19   identity of co-conspirators is important for one -- for a very

20   specific reason, which is, the Government has provided us with

21   statements made by a large number of witnesses that were

22   interviewed during the Government's investigation, and it

23   seems likely that some of those witnesses would, in fact, be

24   called as defense witnesses.

25           The uncertainty of not knowing who the Government

1    considers to be a co-conspirator will pose a challenge to --

2    I suspect, based on experience -- persuading some of those

3    witnesses to appear as defense witnesses if they wanted to.

4    So with respect to that motion for a bill of particulars, it

5    is a very, very specific purpose why, in this case as opposed

6    to perhaps others, it is appropriate for the Court to order

7    the Government to provide us with the names of those

8    co-conspirators.

9            With respect to the request for a bill of particulars

10   identifying the specific claims for payment, though, as I have

11   said in my brief, the Government's indictment does provide

12   notice of the offense that the defendants are charged with,

13   I have no idea whatsoever which claims for payment the

14   Government considers both my client specifically to have

15   participated in in submitting to the Government and defendants

16   more generally.

17           I say -- and let me do them in the reverse order.

18   It's impossible to create -- to prepare a defense to an

19   allegation that false claims were submitted without knowing

20   what those false claims are.  It's particularly hard for my

21   client because, as I touched on in my brief, my client isn't

22   even alleged in all the paragraphs of the indictment of having

23   been involved in submitting false claims.

24           So just for example, and I won't go through the

25   entire argument, but paragraph 34 of the indictment alleges

1    that three of the defendants submitted false claims for test

2    claims without the Medicare beneficiary's consent.  My client

3    is not included in that allegation.

4         Paragraph 33 alleges that false and fraudulent test

5    claims were submitted without the physician's consent.  My

6    client is not included in that allegation.

7         I have no way of knowing which claims I'm going to

8    have to attack or challenge or grapple with at trial based on

9    the Government's indictment.  And unless the Government is

10   alleging that every single claim ever submitted by the company

11   was fraudulent, which I don't understand the Government's

12   allegations to be, and that's not what they have argued in

13   their response, then it is only fair that the defendants be

14   put on notice as to which claims they have to defend against.

15        This is not a case and it's not the sort of crime

16   where there is a reasonable number of transactions that

17   defendants' review in discovery could just perhaps discern on

18   their own which ones were unlawful.  This is a case involving

19   tens of thousands -- my estimate, I don't know the exact

20   number -- of claims, and not only are there claims, but as the

21   Court has heard, those claims for payment are -- given the

22   Government's theory of the case, are related to telephone

23   calls that were made to specific patients in attempts to

24   obtain consent which the Government alleges wasn't obtained.

25        So unless these -- the specific claims that the

1    Government asserts were false are identified, I personally and

2    the defendants in general have -- are put in a position where

3    they have to listen to all of those recordings in an attempt

4    to try to guess which ones the Government is insisting was

5    unlawful.

6          So I have, to some extent, repeated what I have

7    already written in our briefs, but for those reasons and the

8    ones I have stated in writing, we would submit that it's

9    appropriate in this particular case for the Court to order

10   the Government to provide the defendants with the clarity

11   they need to prepare a defense to the allegations in the

12   indictment.

13         THE COURT:  All right.  Thank you, Mr. Berman.

14         Does anyone else wish to be heard on that from the

15   defense side?  Raise your hand if you do.

16         Mr. Donnini.

17         MR. DONINNI:  Your Honor, thank you.

18         I don't mean to be a broken record, but just going

19   back to what I said on the last argument, I agree with

20   Mr. Berman that I don't believe -- and we're going to hear

21   from them shortly -- that the Government is claiming that

22   every single claim is false and fraudulent; however, I did

23   point out that they spoke about Lidocaine and diabetic testing

24   supply claims that totaled $80 million of false and fraudulent

25   claims.

1       So we are left in this position of scratching our

2  head wondering, is it all Lidocaine claims?  Is it Lidocaine

3  claims and DTS claims?  Is it $80 million?  Is $80 million the

4  universe of claims over the five-year period?

5       And what Mr. Berman points out, there are recordings

6  after recordings after recordings, and to not be able to hone

7  in on the specific claims that the Government alleges to be

8  fraudulent, we're put to a herculean effort of trying to guess

9  what those may be.

10       THE COURT:  Thank you.  Anyone else?

11       I see no one else asking to be heard.

12       Mr. McCormack, I take it it's your response on this

13  one?

14       MR. McCORMACK:  Yes.  Thank you, your Honor.

15       Your Honor, I just want to respond to some of the

16  points that were recently raised in the reply and that were

17  raised today in court, and I'll rest on my pleadings for the

18  vast majority of the Government's position, your Honor.

19       THE COURT:  You mean your briefs?

20       MR. McCORMACK:  Yes.  In the Government's briefs,

21  your Honor.

22       Essentially, the Government's indictment is not

23  vague.  As the Court had already articulated today with

24  respect to issuing its ruling on the motion to dismiss, the

25  indictments track the statutory language and provides details,

1    factual details of the fraudulent schemes alleged, and the

2    manner and means in terms of how these co-defendants committed

3    this conspiracy, your Honor.

4         The issue of referring to unnamed co-conspirators

5    as well as not identifying the specific false claims of the

6    indictment does not mean that the indictment is vague.

7    Defense has not produced a case from the Sixth Circuit where

8    a defendant charged with a conspiracy to commit healthcare

9    fraud was granted a bill of particulars with respect to their

10   requests to identify false claims or unnamed co-conspirators,

11   as they do here, your Honor.

12        In their reply, they attempt to distinguish this case

13   from Elhorr by arguing that the substantive counts in Elhorr

14   provide information like the beneficiary's name, information

15   regarding the transactions.  That's exactly what this

16   indictment includes, your Honor, with respect to Counts 4, 5,

17   and 6.  The -- I'm sorry -- 2, 3, 4, 5, and 6, the substantive

18   counts, your Honor.

19        This case is no different than Elhorr.  In Elhorr

20   the only issue was Count 1 with respect to the bill of

21   particulars, the conspiracy to commit healthcare fraud.

22   There were multiple defendants seeking to identify false

23   claims and the identity of unnamed co-conspirators, and there

24   the Court denied that request noting that those are not proper

25   subjects for a bill of particulars.  And that's exactly --

1          THE COURT:  Under the claims identified in Counts 2

2    through 6 of the indictment, do you intend to prove that any

3    other claims submitted were false?

4          MR. McCORMACK:  Yes, your Honor.

5          THE COURT:  Which ones?

6          MR. McCORMACK:  Well, there's a number of claims,

7    your Honor.

8          THE COURT:  And which ones?

9          MR. McCORMACK:  You know, I can't -- I can't identify

10   each false claim right now, your Honor.  I can speak to the

11   universe of false claims.

12         THE COURT:  Can you tell me how many?

13         MR. McCORMACK:  I cannot tell you the exact number of

14   how many false claims were alleged to have been submitted that

15   were fraudulent and false, your Honor.

16         THE COURT:  Can you give me an approximation?

17         MR. McCORMACK:  I cannot.  What I can -- what I can

18   tell you with respect to the discovery, your Honor, the

19   defense relies on McQuarrie for a circumstance where an

20   overproduction of discovery would necessitate a bill of

21   particulars, and that is not the circumstance that we're in

22   here, your Honor.

23         THE COURT:  Yes, but I would like you to stick with

24   my question for a minute.

25         You are intending to offer evidence at trial, I

1     presume, that a number of claims of undetermined amount are

2     false.  How do you intend to prove that, by just showing the

3     paperwork for each of the claims?

4              MR. McCORMACK:  We would put in testimony, your

5     Honor.  For example, one of the allegations is that the claims

6     were submitted with respect to a doctor's MPI number who was

7     used to submit test claims.  Within the discovery production,

8     the first discovery production, there is a folder labeled

9     "Medicare Data."

10             Within that folder there is a subfolder labeled

11    "Medic Data" and that -- through interview reports, that

12    doctor is identified as Dr. Peter Garretts.

13             Within that subfolder there is a file called

14    "Garretts Part D."  That Excel spreadsheet demonstrates all

15    the false claims that were submitted by the co-defendants in

16    this case with respect to that allegation.

17             Additionally, your Honor, with respect to the

18    allegation that Attorney Berman is not aware of any false

19    claims regarding Ms. Peterson, at the bottom of -- I'm

20    sorry -- at paragraph 35 of the indictment, it alleges that

21    the Ms. Peterson conspired with her co-defendants to submit

22    claims for medically unnecessary prescription refills,

23    including dead beneficiaries.

24             Within the discovery production, your Honor, the

25    first discovery production, in that same folder, the "Medicare

64

1    Data" folder, there is a subfolder "Medic Data."

2           Within that folder there is another folder labeled

3    "Bene Sharing."

4           And in that there is a file called "After Death PDE

5    Records."  And that Excel spreadsheet is a list of claims that

6    were submitted for beneficiaries after their death.

7           THE COURT:  Mr. McCormack, is the discovery that

8    you're referencing indexed in any way?

9           MR. McCORMACK:  Well, yes, your Honor.  Every

10   production comes with a letter indicating what the discovery

11   is in terms of its Bates number and its source.  And then

12   within the production itself, your Honor, the data and

13   actually all the discovery is within subfolders identified by

14   the type of discovery or the source of discovery.

15          And then within those subfolders you can whittle it

16   down to exactly what you're looking for; for example, an Excel

17   spreadsheet of all the false claims relating to dead

18   beneficiaries or all the false claims relating to Dr. Peter

19   Garretts' Part D submission.  They are all labeled.

20          The Government has --

21          THE COURT:  So if you were going to, say, prepare for

22   trial yourself, you would be able to identify the source or at

23   least the location of the information for the false claims

24   that you would intend to offer as evidence in trial by Bates

25   number, I guess?

```
 1              MR. McCORMACK:  Yes.

 2              THE COURT:  Or folder?

 3              MR. McCORMACK:  Yes, your Honor, within the folders.

 4   Like, for example, an allegation that medically unnecessary --

 5   I'm sorry -- that prescriptions were transferred from

 6   Defendant Letko's pharmacies to his brother's pharmacies

 7   without patient consent, there is a shared beneficiary

 8   analysis within the data production which demonstrates shared

 9   beneficiaries between both companies which helps identify

10   which universe of patients had their prescriptions transferred

11   from one entity to the other.

12              So with respect to that, your Honor, and those types

13   of Excel spreadsheets, they can be filtered, your Honor, by

14   information such as the date of services, the name of the

15   pharmacy, et cetera.  So these -- you know, these are active

16   Excel spreadsheets that can be filtered and pivot tables can

17   be created to help maximize the utility of that data.

18              THE COURT:  And this has been turned over already?

19              MR. McCORMACK:  Yes, your Honor.  The vast majority

20   of the data was produced within the first production, I

21   believe in October of 2019.

22              There's approximately 28 Excel spreadsheets that were

23   produced with respect to data.  There's -- additionally,

24   there's PDF copies of analysis that was conducted by Medicare

25   contractors such as Quarland (phonetic) which identify the
```

1    number of -- the total universe of payments that each

2    particular pharmacy received with respect to Medicare Part D.

3    So it's possible to look at those PDF files and then figure

4    out the total universe of payments to those entities.

5              And lastly, your Honor, this notion that with respect

6    to a bill of particulars that the defendants are not evident

7    of the -- aware of the allegations against them, in addition

8    to the proper settings which are cited in our pleadings, I

9    believe, your Honor, it's evident from these pleadings as

10   well as the arguments you heard today that the defendants

11   appreciate and understand the allegations against them with

12   respect to Medicare and the -- at least in general, the false

13   claims.

14             So, your Honor, for all those reasons the Government

15   would ask that you deny the defendants' request for a bill of

16   particulars.

17             THE COURT:  Does the Government intend to call as

18   witnesses at trial any individuals whom you would characterize

19   as an unindicted co-conspirator?

20             MR. McCORMACK:  You know, your Honor, that's a good

21   question.  I think there's a number of people that -- you

22   know, this was a large corporation and, you know, at this --

23   at this juncture, I'm not sure I could effectively answer that

24   question.  So I --

25             THE COURT:  Well, let me ask it a slightly different

1    way.

2            Do you -- are you aware of any unindicted

3    co-conspirators that you would not be intending to call as

4    witnesses at trial?

5            MR. McCORMACK:  You know, your Honor, there was a lot

6    of people involved in the submission of these claims.  You

7    know, a lot of people blessed some of the practices that were

8    going on.  But at this point right now I am not aware of

9    calling any unindicted co-conspirators at this time, your

10   Honor.

11           THE COURT:  All right.  Mr. McCormack, any further

12   argument?

13           MR. McCORMACK:  No, thank you, your Honor.

14           THE COURT:  Thank you.

15           Mr. Berman, any follow-up?

16           MR. BERMAN:  No, your Honor.  Thank you.

17           THE COURT:  All right.  The bill of particulars

18   motions are authorized, that is, a bill of particulars is

19   authorized under Rule 7(f) of the Federal Rules of Criminal

20   Procedure, and it is meant to be used as a tool to minimize

21   surprise and assist the defendants in obtaining information

22   needed to prepare a defense and also to preclude a second

23   prosecution for the same crimes.

24           I don't think the double jeopardy concern is foremost

25   in the defendants' motion and the joinders, but rather, trial

1    preparation, I think, is really the main reason why the

2    defense has brought this motion.

3            The cases also tend to look to discovery as an

4    alternative method of providing information to the defendants

5    for trial preparation, and Mr. McCormack has identified a

6    means of determining what false claims the Government intends

7    to offer at trial and so that the defendant can -- defendants

8    can be prepared to address those as they come up.

9            Mr. McCormack tells me right now, and certainly

10   credibly, that he is not able to identify with particularity

11   specific claims that he intends to offer at trial that

12   allegedly were false when submitted, but he has identified

13   the method of locating those materials within the discovery.

14           And so I'm going to direct the Government to identify

15   the folders and subfolders that have been discussed here on

16   the record or any other ones that fall within those categories

17   to the defendants at this time, that is, to identify them to

18   the defendants so that they know where to look within the

19   discovery materials for the evidence that would constitute

20   false claims or at least the universe of false claims from

21   which the Government might select evidence to offer at trial.

22           And I will deny the motion for a bill of particulars

23   without prejudice and permit the defendants to renew that

24   motion after they have taken a look at the information

25   furnished by the Government so that they can look at the

1    discovery materials, and if there is additional confusion or

2    some vagaries with respect to what the evidence might be and

3    what claims they must defend against, we can approach it at

4    that time.

5            So the motion is denied without prejudice.  The

6    Government is directed to produce the materials I have

7    identified, and I guess it's really locator materials,

8    because the materials themselves have been produced already.

9            And I'll set a deadline of the 24th, that's two

10   weeks, for the Government to furnish that to the defendants.

11           The motion otherwise is denied.

12           Finally, we have Defendant King's motion to sever.

13   That's Docket Number 90.

14           Ms. Webster, I think that's your motion; is that

15   correct?

16           MS. WEBSTER:  It is, your Honor.  Thank you.

17           THE COURT:  All right.  You may proceed.

18           MS. WEBSTER:  Thank you, your Honor.  I know that the

19   Court has --

20           THE COURT:  Before you do, could I ask you to just

21   stand by for one second?

22           MS. WEBSTER:  Sure.

23           THE COURT:  All right.

24      (Pause in the proceedings at 3:47 p.m.)

25           THE COURT: Thank you.  I wanted to -- I wanted to

70

1   print the Government's response to the motion, because I find

2   it easier to navigate this one with a paper copy rather than

3   the online copies.

4           But in any event, go ahead, Ms. Webster.

5           MS. WEBSTER:  Thank you, your Honor.

6           Your Honor, I know the Court has read the motion,

7   so I just have a few you points that I want to highlight.

8           The Government essentially is conceding that there is

9   a Bruton issue in this case, which is based on Mr. Lazeki's

10  not one statement, not two statements, but four statements

11  that have been submitted or given to law enforcement.

12          And so, your Honor, we are hanging our hat on United

13  States versus Flowers.  The Government does not distinguish

14  that case in its response.  And I think that case is the more

15  appropriate case to follow on these facts.

16          I would also note, your Honor, that the Government

17  is stating that if we open the door with respect to, I guess,

18  Mr. Lazeki's statements that it would be willing to redact

19  names and use neutral terms or just outright remove my

20  client's name.  And I think that's very problematic when

21  you look at the big picture.

22          So imagining jurors looking at documents that are

23  redacted in multiple places, I think that naturally, naturally

24  would lead to the jury trying to figure out who it is that is

25  being referred to.  And I don't think that that is a realistic

1    option and that Mr. King should be severed, your Honor.

2           I also, your Honor, would state that this case, as

3    you have heard, has a lot of discovery.  In a five-defendant

4    case it's not clear who the Government thinks played bigger

5    roles or smaller roles in terms of how they lay out their

6    indictment.  And so I think that that presents this case as

7    one that's fraught with opportunity to prejudice Mr. King.

8           We have antagonistic defenses, as you can see here,

9    as we have said with respect to Mr. Lazeki, at least, pointing

10   the finger at my client, and I think that that is going to

11   be problematic.

12          And I know it's difficult to win on an antagonistic

13   issue.  I know those aren't granted very often, your Honor,

14   but I think if ever there was a case, that this is a case that

15   presents itself to sever Mr. King.

16          And so, your Honor, for those reasons, I am asking

17   the Court to sever us from this case.

18          THE COURT:  Thank you, Ms. Webster.

19          Does anyone else wish to -- anyone else on the

20   defense side wish to address this motion?  Let me just go

21   through the list.

22          Mr. Donnini?

23          Mr. Donnini is shaking his head.  I take that as a

24   "no."

25          MR. DONNINI:  No.  Thank you, your Honor.

Motion Hearing - September 10, 2020

```
 1              THE COURT:  Mr. Burdick?
 2              MR. BURDICK:  No, sir.
 3              THE COURT:  Thank you.
 4              And Mr. LaRene?
 5              MR. LaRENE:  No.  Thank you, sir.
 6              THE COURT:  Mr. Berman.
 7              MR. BERMAN:  No, your Honor.
 8              THE COURT:  Thank you.
 9              MR. BURDICK:  I think Mr. Eppel had raised his hand,
10     your Honor.
11              THE COURT:  I'm sorry?
12              MR. EPPEL:  Your Honor, I apologize.  This is
13     Mr. Eppel on behalf of Mr. Letko.
14              THE COURT:  Yes.  I asked Mr. Donnini and we only
15     have one at a time.
16              Do you want to address this, though, really?
17              MR. EPPEL:  There were a couple small points I wanted
18     to make, your Honor.
19              THE COURT:  Well, okay.  Go ahead.  Make your points.
20              MR. EPPEL:  The proposed redactions that the
21     Government has laid out, I think, are problematic in three
22     particular instances.  And I'm happy to go through those, if
23     you like, your Honor.
24              The first one is on page 12, and it's the second
25     bullet point regarding patient transfers.
```

Motion Hearing - September 10, 2020                                    73

1          THE COURT:  Page 12 of what?

2          MR. EPPEL:  I'm sorry.  This is of the Government's

3    response.  So this is the Government's response which lays out

4    the proposed redactions to the statements.

5          THE COURT:  So this is page 12 of the brief itself?

6          MR. EPPEL:  Correct.

7          THE COURT:  Okay.  I've got it.

8          MR. EPPEL:  And so the second bullet point down

9    regarding patient transfers, they propose redacting it to say

10   that "Lazeki brought up his concerns to others and Lazeki was

11   instructed to continue to fill prescriptions."

12         I think the problem there is, your Honor, the only

13   people that could have instructed Mr. Lazeki would be Mr. King

14   or Mr. Letko.  So I don't know that that proposed redaction

15   cures the issue.

16         The second one, your Honor, that I'll point to is on

17   the next page, page 13, and it's the first bullet point, where

18   they propose redacting it to say that "Lazeki denied that AAMP

19   submits a claim in order to hold the patient until the refill

20   prescription is ready to be dispensed, although it may have

21   been happening at one of the other pharmacies."

22         That proposed redaction is actually worse for us,

23   your Honor, because the original statement is that it was

24   "happening at one of the other pharmacies owned by the Letko

25   brothers."  That's not who is on trial here.

1          And if it's changed to just say "at one of the other

2     pharmacies," the jury may conclude that they are talking about

3     other A1C Pharmacies which are at issue in this trial, and

4     which are, you know, pharmacies that Jim Letko himself had

5     interest in as opposed to pharmacies that were owned by his

6     brothers, which are not at issue in this trial.

7          And the same issue occurs in -- further down on

8     page 13.  It is the -- I guess, the third main bullet point

9     regarding post-interview information.  They propose changing

10    it from "They just rotated the patients to one of the other

11    Letko brothers' owned pharmacies" to "They just rotated the

12    patients to one of the other pharmacies."

13         Again, the implication there may be the jury could

14    think we're talking about other A1C Pharmacies that Mr. Jim

15    Letko had an interest in as opposed to pharmacies his brother

16    might have had an interest in.  That to me seems worse for

17    Mr. Letko if it's brought in that way.

18         And so I just wanted to bring the Court's attention

19    to those three particular redactions that are proposed by the

20    Government.

21         THE COURT:  Thank you, Mr. Eppel.

22         I don't see anyone else that wishes to be heard.

23         And so is this yours, Ms. Dubal or Mr. McCormack?

24         MS. DUBAL:  It's mine, your Honor.

25         THE COURT:  All right.  Thank you.  Go ahead, if you

1    wish.

2              MS. DUBAL:  Thank you so much.

3              So, your Honor, I'll keep my argument brief and

4    really just focus on the defendant's reply.  The first point

5    being that the defendant has stated that the Government does

6    not address Flowers.  From the Government's vantage point,

7    they focus on four statements, and Mr. Eppel has added one

8    additional statement that isn't covered by the reply which I

9    can address that.

10             In terms of the first statement that is referenced,

11   and that's in Exhibit A at 4, and that is -- excuse me.  Just

12   one moment, your Honor.

13             That is the statement with regard to -- I just need

14   one moment, your Honor.

15             That is the statement that -- in the defendant's

16   reply brief that states that Lazeki brought up his concerns

17   to Jim and -- Jim and King.

18             Your Honor, the Government's position is that this

19   comports with the case law that is cited in the Government's

20   brief and is more in line with Vasilakos than it is with

21   Flowers.  I'm not sure if I'm pronouncing that correctly, but

22   I will spell it.  It's V-a-s-i-l-a-k-o-s.

23             The Government's position is that Flowers is

24   distinguishable because in that case the Sixth Circuit

25   analyzed the issue after trial.  And the Sixth Circuit was

1    really focused on the fact that evidence was presented

2    immediately prior to the admission of defendant's statements,

3    effectively -- of the defendant's statement, effectively

4    negated the cured Brutonized statement.

5            Since we're in a pretrial stage right now that issue

6    doesn't exist here and the Government does not intend on

7    making that same mistake in its case-in-chief.

8            Now, your Honor, with that being said, if the Court

9    is inclined to grant this motion based at all on this

10   statement alone, the U.S. proposes to redact the entirety

11   of the statement from Mr. Lazeki's -- from that --

12           THE COURT:  When you say "redact the entirety of the

13   statement," that means not offer it in evidence; right?

14           MS. DUBAL:  That's right, your Honor.  That's right.

15           THE COURT:  Do you intend to offer any of these

16   statements in your case-in-chief?

17           MS. DUBAL:  Your Honor, you know, I think that --

18   yes, we do intend on offering the statement, Mr. Lazeki's

19   statement in our case-in-chief.  I think the -- I think at a

20   trial phase, depending on how the evidence is presented, you

21   know, I think that I have been in circumstances where we will

22   present a defendant's statement and parts of it are redacted

23   after speaking with defense counsel, depending on how the

24   evidence has played out, and that's obviously something that

25   the Government is willing to do.  But at -- but yes, we do

1    anticipate, at this stage, introducing some of these

2    statements into evidence.

3         And when you say -- and just to clarify, your Honor,

4    and I should have done this before, the United States intends

5    on introducing Mr. Lazeki's statement subject to the

6    redactions that are proposed here in this -- in our response.

7         The next statement that -- in the defendant's reply

8    brief that is addressed at Exhibit A at 3 that involves Letko

9    instructing Lazeki to dispense supplies as a part of the

10   Lidocaine campaign.

11        Your Honor, the Government has properly cured that

12   statement by removing any mention or obvious implication of

13   the defendants. Since the Government has properly cured the

14   statement, the defendants are now taking issue with the term,

15   "Lidocaine campaign" and stating that it implicitly refers to

16   others because of the way a campaign is inherently run.

17        The term "Lidocaine" does not implicate Bruton

18   because this term does not facially incriminate the other

19   defendants, and therefore, does not violate the confrontation

20   clause. This is simply defendant's attempt to sort of strip

21   the co -- Mr. Lazeki's statement by creating and calling this

22   a Bruton issue.

23        Now, as far as Exhibit A at 4, and this is what

24   Mr. Eppel referenced with regard to modifying the language

25   of the two statements that refer to the Letko brothers'

1    pharmacies, the Government's position is that Flowers is not

2    implicated with regard to the Government's proposed edits to

3    this statement.  These statements arguably don't implicate

4    Bruton, since had the report been written such that each

5    individual pharmacy was named or if the pharmacies were

6    referred to as the A1C Pharmacies or the Global Pharmacies --

7    and for your Honor's reference, the Global Pharmacies are

8    Mr. Letko's brother, John Letko's, that's the name of his

9    organization, the Global Pharmacies -- this would not be a

10   valid Bruton claim.

11         And under the defendant's argument there is no

12   reference to -- if we were to adopt the defendant's argument

13   as to this statement, there is no reference to any of the

14   specific A1C Pharmacies that would be admissible through the

15   Lazeki statements, not even All American Medical Pharmacy,

16   which is AAMP, which is the pharmacy that Lazeki worked at.

17         This is a conspiracy to commit healthcare fraud, as

18   your Honor is well aware, and it is specifically alleged in

19   the indictment that patient transfers were taking placing

20   amongst the A1C and Global Pharmacies whenever the A1C

21   Pharmacies lost the PBM contract, and mere references to

22   those pharmacies in a defendant's statement does not

23   necessarily trigger Bruton.

24         However, with that being said, in an abundance of

25   caution, the Government did propose to cure these statements

1   to remove any mention or obvious implication of Mr. Letko.

2   Referring to the A1C Pharmacies as "other pharmacies" instead

3   of "the Letko pharmacies" does exactly what Bruton is

4   concerned with, which is that the jury would place all the

5   blame on Letko by virtue of Mr. Lazeki's statement referencing

6   the A1C Pharmacies and Letko-owned or Letko brothers'

7   pharmacies.

8           The Government's position is that the redaction

9   properly cures any potential Bruton issue for the defendants.

10          And again, your Honor, if your Honor is inclined to

11  grant this motion based on these two statements, the United

12  States would propose to redact the entirety of the statement

13  in question to remove any reference at all to even Mr. Letko

14  and Mr. King.

15          THE COURT:  All right.  You do concede, Ms. Dubal,

16  that these -- none of these statements are admissible against

17  any of the defendants except Mr. Lazeki; correct?

18          MS. DUBAL:  Yes, your Honor.

19          THE COURT:  All right.  Thank you.  Any further

20  argument?

21          MS. DUBAL:  I do not.  Thank you, your Honor.

22          THE COURT:  Thank you.

23          Ms. Webster, anything else?

24          MS. WEBSTER:  No, your Honor.  I don't have anything

25  further.

1    THE COURT:  All right.  The joinder rule is Rule 8

2    and it permits the Government to join offenses of a similar

3    character or based on the same act or transaction and join

4    defendants on the same basis.

5        Rule 14 authorizes severance.  Severance is

6    authorized if it appears that consolidation will prejudice the

7    defendant.  Prejudice arises when there is serious risk that a

8    joint trial would compromise specific trial rights of one of

9    the defendants or prevent the jury from making a reliable

10   judgment about guilt or innocence.

11       The defendant presents two bases for severance.  One

12   is the Bruton problem.  The other is the antagonistic defense

13   problem.  The second one is much easier to deal with, in my

14   view.

15       Antagonistic defenses only pose a problem when one

16   person's claim of innocence is predicated solely on the guilt

17   of a co-defendant.  There is no such claim here, and the

18   defendant merely argues that they may attempt to foist -- that

19   there is no suggestion that they may attempt to foist blame

20   on co-defendants or argue that they were less culpable.

21       The Sixth Circuit, in United States versus Warner,

22   indicates that the antagonistic defenses must present some

23   sort of conflict that is irreconcilable.  I don't find that

24   there is a basis for severance just because of antagonistic

25   defenses, and that ground for the motion does not persuade.

1         The Bruton problem is more substantial here.  I

2    have taken a look at the statements.  The statement would

3    be admissible against Mr. Lazeki at trial under Rule 105.

4    Rule 105 -- that's Evidence Rule 105, says that evidence

5    admissible against one person can come in with a limiting

6    instruction, but if a limiting instruction is ineffective,

7    then the rule of balancing unfair prejudice and probative

8    value engages, Rule 403.

9         The prejudicial effect of such a statement is tied

10   directly to the Sixth Amendment confrontation right, and

11   hence, we have a Bruton problem.

12        Redacting the statements sometimes solves the

13   problem, but just taking a look at the Government's responses

14   and looking at the proposed redactions, I'm not particularly

15   persuaded that they would be effective in curing the prejudice

16   enuring to the other defendants in the case.

17        Redaction and sanitizing statements like this is

18   always a messy business.  The decisions usually are best made

19   contextually.  But my solution here, if I deny severance,

20   which the Government urges me to do, is to simply exclude the

21   statements that I find to be harmful.

22        I'm not going to give an advanced ruling on which of

23   these statements can come in and can't right now because, as

24   I said, context is important.

25        But I will deny the motion to sever Mr. King's case

```
 1    from the rest of the defendants for a joint trial, warning
 2    the Government, however, that the evidence that they may want
 3    to offer in the form of Mr. Lazeki's statements may not be
 4    received at the appropriate time.
 5              With that said, however, the motion is denied.
 6              Now, I don't believe I have any other motions on the
 7    docket that are --
 8              MR. LaRENE:  Judge, the adjournment motion.  The
 9    motion to adjourn the trial date was noticed for today, Judge.
10              THE COURT:  Mr. LaRene, I don't think I recognize
11    adjournment motions.  That's my policy.
12              MR. LaRENE:  You don't recognize -- you can't see
13    them?
14              THE COURT:  I'm sorry.  I can't hear you.  Did you
15    say "adjournment"?
16              MR. LaRENE:  Yes.  I said joint motion.  Joint
17    motion.
18              THE COURT:  Oh, all right.
19              MR. LaRENE:  Perhaps that will make it easier to
20    find.
21              THE COURT:  Yeah.  No, in all seriousness, this is a
22    motion that basically circumstances will take care of.  We
23    have a trial date on November -- what is it?
24              MR. LaRENE:  November 3, Judge.
25              THE COURT:  Yeah.  The likelihood of this trial
```

1    proceeding ahead on November 3 in this courthouse is nil.

2                MR. LaRENE:  Understood.

3                THE COURT:  I can set a trial date.  I think you

4    wanted something in April.  Isn't that what you asked for?

5                MR. LaRENE:  We all sort of got together and in a

6    series of e-mail communications came up with a date of

7    April 12 or thereafter that basically accommodated all

8    counsels' schedules.  And I don't remember what -- I don't

9    remember the details at this time.

10               THE COURT:  You say "all," meaning including the

11   Government?

12               MR. LaRENE:  Including the Government, Judge.

13               THE COURT:  And so you were of one mind?

14               MR. LaRENE:  It's hard to believe, I know, but I

15   believe it is true in this case.

16               THE COURT:  Okay.  And so you made phone calls, you

17   say?

18               MR. LaRENE:  We -- I think it was mostly e-mails.

19               THE COURT:  All right.  Well, still, that's the overt

20   act.

21               MR. LaRENE:  That's the overt act.  That's right.

22   That's right.

23               THE COURT:  You know, I think I'm pretty comfortable,

24   subject to my -- subject to a strenuous objection from my case

25   manager, granting that motion and setting that date, just

1    for planning purposes, and excluding the time based upon the

2    CARES Act and other exigencies that fall within the umbrella

3    of the coronavirus problem.  Hopefully by then we will have

4    juries back in the building.

5           In fact, I spent all morning with a group going

6    through to try to identify courtrooms that we could use so

7    we could get jury trials started again, and the prospect of

8    trying multi-defendant cases in this courthouse and trying

9    to keep social distancing within the facilities that we have

10   are quite daunting.

11          And I guess that I would include all of those

12   observations in my finding to exclude the time between now and

13   your new date.  But I'll grant that motion.

14          MR. LaRENE:  Thank you, sir.

15          THE COURT:  And for planning purposes, I will enter

16   an order.

17          Probably what I will do in the order is set a status

18   conference in about 30 to 45 days that we can conduct not

19   necessarily on the record and not with the necessity of

20   defendants being present but with counsel present, so we can

21   talk about some of the discovery problems and issues that have

22   cropped up today and production and how things are going.

23          I don't believe that there are any other pretrial

24   motions except Ms. Peterson's severance and venue motion,

25   which is Docket Number 63, that I have under advisement right

```
 1   now.  But there is nothing else that I think I have to decide.
 2           Do you agree, Ms. Dubal?
 3           MR. LaRENE:  I think that's correct, Judge.
 4           THE COURT:  Mr. LaRene agrees.
 5           Does the Government agree?
 6           MS. DUBAL:  Yes, your Honor.  Thank you.
 7           THE COURT:  All right.  All right.  Okay.  Now, is
 8   there anything else that we need to discuss this afternoon?
 9           From the Government first?
10           MS. DUBAL:  Not from the Government, your Honor.
11   Thank you.
12           THE COURT:  Thank you.
13           Mr. Donnini?
14           MR. DONINNI:  No, your Honor.  Thank you.
15           THE COURT:  Mr. Eppel?
16           MR. EPPEL:  Sorry.  No, your Honor.
17           THE COURT:  And Ms. Webster?
18           MS. WEBSTER:  Nothing further.  Thank you.
19           THE COURT:  Mr. Burdick?
20           MR. BURDICK:  No, sir.  Nothing.  Thank you.
21           THE COURT:  All right.  And Mr. LaRene, you said no.
22           MR. LaRENE:  No, sir.
23           THE COURT:  And Mr. Berman?
24           MR. BERMAN:  No, your Honor.  Thank you.
25           THE COURT:  All right.  Thank you all.  I appreciate
```

86

1   you participating in this fashion.  I hope you all stay well

2   and safe.

3            Court is adjourned.

4                (Proceedings adjourned at 4:11 p.m.)

5                       *       *       *

6

7

8

9            **CERTIFICATE OF COURT REPORTER**

10

11

12       I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   _____s/ Rene L. Twedt_____      _October 14, 2020_
     RENE L. TWEDT, CSR-2907, RDR, CRR, CRC      Date
16       Federal Official Court Reporter

17

18

19

20

21

22

23

24

25